# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 27, 2011

No. 10-50614

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ROBERT MACIAS, JR., also known as Robert Macias,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before JOLLY, DeMOSS, and PRADO, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Robert Macias, Jr. appeals the district court's denial of his motion to suppress a firearm uncovered during a warrantless automobile search by a Texas Department of Public Safety officer on Interstate 10 near Pecos County, Texas. The firearm found in the search of the truck Macias was driving is at the bottom of Macias's conviction for being a felon in possession of a firearm. Because we conclude that the trooper unconstitutionally prolonged Macias's detention by asking irrelevant and unrelated questions without reasonable suspicion of criminal activity, we reverse and vacate the judgment of conviction, and remand the case for entry of a judgment of acquittal.

No. 10-50614

I.

On the morning of November 22, 2009, Trooper Juan Barragan ("Trooper Barragan") of the Texas Department of Public Safety was on patrol, driving westbound on Interstate Highway 10 in Pecos County, Texas. As he drove his patrol vehicle into the median separating eastbound and westbound traffic, he noticed that the driver of a passing red pickup truck headed in the eastbound direction was not wearing a seatbelt. Failure to wear a seatbelt while riding in the front seat of a passenger vehicle during its operation is a violation of Texas law. *See* TEX. TRANSP. CODE ANN. § 545.413(a) (Vernon 2009). Trooper Barragan completed his turn and followed the red pickup truck. He paralleled the truck and visually confirmed that the driver, the defendant Macias, was not wearing a seatbelt. Trooper Barragan initiated a stop of the truck at this time; a videocamera and microphone mounted in the patrol vehicle recorded the entire traffic stop.

After both vehicles came to a stop on the shoulder of the highway, Trooper Barragan exited his patrol vehicle and approached the passenger side of the truck. He identified himself to Macias and the passenger and advised that he had stopped them because Macias was not wearing a seatbelt. He noticed that the passenger was not wearing a seatbelt either. Trooper Barragan requested Macias's driver's license and proof of insurance. Macias handed Trooper Barragan his driver's license, but explained that he did not have proof of insurance for the truck. The record is unclear as to the timing, but the passenger, later identified as Octavia Zillioux ("Zillioux"), handed her identification card to Trooper Barragan as well. At this point, Trooper Barragan noticed that Macias had left the truck in gear, and it began to roll forward such that he asked Macias to put it in park. Trooper Barragan then proceeded to ask Macias where and for what purpose the two were traveling. Macias informed him that they were traveling to Victoria, Texas, where his sister lived. Trooper

No. 10-50614

Barragan again inquired about proof of insurance, and Macias explained that the truck belonged to his girlfriend, Patti Parra ("Parra"), and that she had insurance for the vehicle, but he did not have it with him. After listening to an exchange between Macias and Zillioux about the insurance, Trooper Barragan asked if they were related. Zillioux informed Trooper Barragan that she was Parra's daughter. This prompted Trooper Barragan to inquire about her age, to which she gave a response, though her answer on the video recording is unclear. Macias, when asked, explained to Trooper Barragan that he and Zillioux would be in Victoria for three days. For the third time, Trooper Barragan questioned Macias about proof of insurance, prompting Macias to state that Parra had left it for him before he left Arizona, but he had forgotten to take it with him. Trooper Barragan then asked Macias about his current employment, to which Macias replied that he was not employed currently, and that one reason for the trip to Victoria was to visit with a doctor at the VA clinic. Trooper Barragan then questioned Macias about the purpose for his visit to the doctor. Macias explained that he had back pain. This initial exchange between Trooper Barragan, Macias, and Zillioux lasted approximately two minutes.

At the suppression hearing, Trooper Barragan testified that, in comparison to other traffic stops he had conducted for seatbelt violations, Macias appeared unusually nervous and uncomfortable with the stop during this initial exchange. When asked specifically what drew his attention to Macias's nervousness, Trooper Barragan stated: "There was [sic] different things that normally don't take place in a traffic stop. Mr. Macias, again, he was very nervous. His answers – his – just he wouldn't make eye contact. He was uncomfortable with the stop." Trooper Barragan noted also that he had to ask Macias to put the truck in park.

Trooper Barragan then had Macias exit the truck and follow him to the area in front of his patrol vehicle so they could "visit" about the seatbelt

3

violation, and also, according to Trooper Barragan's testimony, he could determine why Macias was unusually nervous. This also allowed Trooper Barragan to hear Macias's answers more clearly. As soon as Macias stepped on the grass next to the roadside, Trooper Barragan asked Macias a series of questions. In response to a question about his work, Macias informed Trooper Barragan that he was a cement finisher. He responded "no, no" when Trooper Barragan asked if Macias had his "own little company." He further explained that he was retired currently. Trooper Barragan declined Macias's offer to look at paperwork in the truck that would confirm this, noting that he would take Macias at his word. Trooper Barragan then said he simply wanted to ask a few more questions. This prompted Macias to exclaim that he was tired because he had been driving from Arizona all night, and he explained that, in fact, he had been ready to stop at a motel in the next town to rest when he was pulled over. Trooper Barragan then inquired if Macias had ever visited Victoria before this trip. Macias replied that he had been to Victoria on a prior occasion, but rather than drive, he had flown to Houston and taken a bus to Victoria. After having Macias confirm that the address on his driver's license was correct, Trooper Barragan asked Macias if he had "ever been in trouble before." Other than tickets, Macias said that he had not been in "trouble" before. This exchange between Macias and Trooper Barragan lasted approximately one minute.

Trooper Barragan instructed Macias to remain in front of the patrol vehicle. Trooper Barragan returned to the truck, checked its VIN number, and then walked to the passenger window to speak with Zillioux. After declining her offer to speak with Parra on the phone about the insurance, Trooper Barragan proceeded to ask Zillioux a series of questions, including whether she and Macias had been driving all night, what time they had left Arizona, and whether they had been to Victoria previously. Zillioux confirmed that she and Macias had traveled through the night from Arizona, and that Macias intended to see a

doctor at the VA clinic in Victoria. He then inquired about how long Parra and Macias had been in a relationship. Trooper Barragan then asked Zillioux if Macias had ever been in "trouble" before. Zillioux replied yes, but when pressed, stated that she did not know why he had been in trouble. Trooper Barragan then launched into another series of questions, including how long Zillioux and Macias intended to stay in Victoria, where the location of their stuff was in the truck, how many children Zillioux had, who was watching her children while she was gone, and why Parra had not accompanied her and Macias on the trip. Upon learning that Parra had not come on the trip because she worked, Trooper Barragan wanted to know for whom Zillioux, Parra, and Macias worked. At the suppression hearing, Trooper Barragan admitted that his questions to Zillioux had no relevance to Macias's failure to wear a seatbelt. Two more minutes elapsed during this series of questions.

Trooper Barragan returned to Macias and again asked if he had ever been in "trouble," imploring Macias to "shoot straight" with him. Trooper Barragan testified that Macias went "around the question a little bit," before finally admitting that he had been in prison previously. When asked by Macias if that is what he meant by "trouble," Trooper Barragan scolded Macias, stating that the question was whether Macias had *ever* been in trouble. Macias further explained that he had been imprisoned for ten and a half years on an attempted murder conviction. Trooper Barragan questioned Macias about the contradiction, to which Macias responded that unless specifically asked, he does not bring it up, an explanation that Trooper Barragan said he understood. Trooper Barragan testified that Macias appeared even more nervous than before at this point. He then questioned Macias about his failure to wear a seatbelt, which Macias attributed simply to forgetting to fasten it after leaving a nearby rest-stop. Trooper Barragan advised Macias that he was going to receive a citation for failure to wear a seatbelt, but to cut Macias some "slack," he was not

going to receive a citation for Zillioux's failure to wear her seatbelt. Trooper Barragan counseled Macias about the safety concerns of failing to wear a seatbelt before finally informing Macias that he also was going to receive a citation for no proof of insurance. By this point, nearly eleven minutes had passed since Trooper Barragan had pulled over the truck.

Trooper Barragan returned to his patrol vehicle to run checks on the vehicle, Macias, and Zillioux. The computer check revealed that, in addition to the attempted murder conviction, Macias had been arrested for other offenses, including marijuana possession. He had no outstanding warrants though. The check on the truck confirmed that it was registered to Parra, as indicated by Macias and Zillioux at the beginning of the stop. Approximately ten minutes passed while Trooper Barragan awaited the results of dispatch to run the computer checks. After printing the citations, Trooper Barragan walked back to Macias, who was still standing in front of the patrol vehicle, and explained the citations, the court's contact information, and the date by which Macias was required to satisfy the citations. Macias signed the citations.

After handing Macias the citations and his driver's license, but still holding Zillioux's identification card, Trooper Barragan said, "hey, can I ask you a couple of questions." Macias said okay, and Trooper Barragan inquired whether Macias had ever been "in trouble with possession." When Macias responded no, Trooper Barragan challenged his answer, asking why marijuana possession had come up in the computer check. Macias seemed confused, but then relented and explained that he had been arrested, but the charges had been dismissed. When asked by Trooper Barragan when he last used marijuana, Macias said 1992 or 1993. While asking this question, Trooper Barragan handed

No. 10-50614

Macias Zillioux's identification card.[1] He did not advise Macias that he was free to go.

Trooper Barragan then asked whether there was anything illegal in the truck that he needed to know about, such as large amounts of money, narcotics of any sort, marijuana, cocaine, or heroin. Macias protested that there was nothing, and that he was traveling with his girlfriend's daughter. Trooper Barragan then asked Macias for consent to search the truck. The initial exchange between the two men following Trooper Barragan's request as reflected on the video recording is garbled by dispatch, though the video recording reflects that Macias ultimately gave consent to search the truck after his protestations to the search were met by Trooper Barragan noting that Macias has a "shady" background and that Trooper Barragan was simply doing his job. After granting

---

[1] The specific circumstances surrounding this sequence of events are contested heavily by Macias. Trooper Barragan initially testified on direct examination that after having Macias sign the citations, he gave him the citations and his driver's license. On cross-examination, Trooper Barragan agreed with defense counsel that, when he asked Macias if he would answer more questions, Trooper Barragan had not yet handed back the driver's license. Then after reviewing the video recording of the stop again, he agreed with defense counsel that he handed Macias the citations before he returned the driver's license and identification card. He immediately then stated that he handed Zillioux's identification card "there at the end." Unfortunately, it is difficult to discern what Trooper Barragan is referring to by "there at the end" because he is reviewing the video recording while testifying. Later in the hearing, Trooper Barragan responded affirmatively when the district court asked if he had returned the citations, Macias's driver's license, and Zillioux's identification card before requesting permission to search the vehicle.

In its ruling from the bench, and in the subsequent order memorializing that ruling, the district court found that Trooper Barragan handed Macias the citations together with his driver's license, and simultaneously asked Macias if he would answer more questions. The district court did not make a finding in its order as to when Trooper Barragan handed Zillioux's identification card back to Macias, though it found that Trooper Barragan asked for permission to search after handing back the driver's license, the citations, and Zillioux's identification card. After reviewing the video recording, we are not left with a firm conviction that the district court erred in its finding that Trooper Barragan returned Macias's driver's license with the citations initially, and then returned Zillioux's identification card at some point before asking for permission to search. The video recording does reflect that, while asking Macias about the last time he used marijuana, Trooper Barragan handed Macias a small piece of paper, which, giving deference to the district court's finding, was Zillioux's identification card.

consent, Macias, when asked, said he would be responsible for anything found in the truck because he was driving, but when pressed again, Macias said "it depends," since he was unsure what would be found in the truck. At this point, Macias put his hands in his pockets, prompting an order from Trooper Barragan to keep them out of his pockets. Again imploring Macias to shoot "straight" with him, Trooper Barragan asked if Macias would be responsible for anything found in the truck. He then demanded to know what he would find in the truck. Macias was unsure, stating that there "might" be a "roach." This prompted Trooper Barragan to demand to know where he would find the roach. Confused, Macias stated, "I don't know . . . look for it." When Zillioux, still sitting in the truck, began to call to Macias and Macias turned to answer her, Trooper Barragan, using the clipboard in his hand, directed Macias to remain here and "pay attention" to him. He again told Macias to "shoot straight" with him and demanded to know "where's it at." Macias replied, "Where's what at?" Trooper Barragan said "you know . . . ." The two men continued this back-and-forth over what would be found in the truck. Trooper Barragan then asked Macias to place his hands out in front of him. Macias's hands were shaking, and when Trooper Barragan demanded to know why, Macias replied that he was tired and "going scared" because he was not the only person who drove the truck. Finally, Macias relented and said he would take responsibility.

Trooper Barragan frisked Macias and directed him to stand by a sign further down the roadside, within shouting distance, and to face away from the truck. He then questioned Zillioux further, including about her own drug use, before ordering her out of the truck. After emptying her pockets and pulling up her pants to expose her ankles, Zillioux was directed to stand down the roadside, about halfway between the truck and Macias, and to face away from Macias and toward the truck. Approximately seventeen minutes after he began the search of the truck, and forty-seven minutes after initiating the stop, Trooper Barragan

found an unloaded firearm and ammunition in a closed bag belonging to Macias.[2] Macias was arrested approximately one hour and thirty-nine minutes after Trooper Barragan initiated the stop.

A grand jury in the Western District of Texas indicted Macias for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). After his indictment and before trial, Macias moved to suppress the firearm as fruits of an unconstitutional detention. Following a suppression hearing on March 17, 2010, the district court orally denied the motion. It entered an order on March 22 memorializing its oral ruling. In sum, the district court determined that Trooper Barragan's questions to Macias and Zillioux before issuing the citations were proper; that Trooper Barragan did not detain Macias, despite his nervous behavior and the discrepancy about his criminal record, and instead chose to issue the citations; that after receiving the citations and his driver's license, Macias was free to leave, and thus his subsequent interaction with Trooper Barragan was a consensual encounter that did not illegally extend the traffic stop; and that Trooper Barragan asked for consent to search after handing Macias the citations, his driver's license, and Zillioux's identification card. Finding no improper detention, the district court denied the motion to suppress. The district court, in an abundance of caution, also analyzed Macias's separate argument that his consent to search the vehicle was invalid, concluding that the Government met its burden of demonstrating that Macias's consent for the search was freely and voluntarily given. Macias subsequently entered a conditional plea of guilty, expressly reserving the right to appeal the district court's denial of his suppression motion. He was later sentenced to thirty-three

---

[2] Trooper Barragan found drug paraphernalia, including a heroin needle and a crack pipe, before locating the firearm in Macias's duffel bag. Zillioux took responsibility for the drug paraphernalia, though she was not arrested.

months of imprisonment and three years of supervised release.  Macias timely appealed, invoking our jurisdiction under 28 U.S.C. § 1291.

## II.

On appeal, the question presented is whether Trooper Barragan's subsequent actions after he legitimately stopped the truck were reasonably related to the circumstances that justified the stop, or to dispelling any reasonable suspicion developed during the stop.[3]  We review the factual findings of the district court for clear error and its legal conclusions *de novo*.  *United States v. Gomez*, 623 F.3d 265, 268 (5th Cir. 2010).  We view the evidence in the light most favorable to the Government as the prevailing party in the district court.  *Id.* at 269.

The Fourth Amendment guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  "The stopping of a vehicle and the detention of its occupants is a seizure within the meaning of the Fourth Amendment."  *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000).  We analyze the legality of traffic stops for Fourth Amendment purposes under the standard established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).  Under the *Terry* analysis, the legality of a traffic stop is tested in two parts.  *Id.*  First, we examine whether the stop of the vehicle was justified at its inception.  *Id.*  Second, we evaluate whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place.  *Id.*  Macias concedes that the stop was a valid traffic stop for failure to wear a seatbelt.  He argues, however, that Trooper Barragan exceeded the

---

[3] Though not the owner, because Macias had the owner's permission to drive the truck, he has standing to contest its search.  *United States v. Mendoza-Burciaga*, 981 F.2d 192, 196 (5th Cir. 1992).

scope of that stop when he asked questions unrelated to the purpose and itinerary of the trip that impermissibly extended the duration of the stop and without developing reasonable suspicion of additional criminal activity.

"An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *modified on denial of reh'g*, 622 F.3d 383 (5th Cir.), *cert. denied*, 131 S. Ct. 620 (2010). In such an instance, he may further detain the vehicle's occupants "for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.* As part of the investigation into the circumstances that justified the stop, an officer may examine driver's licenses and vehicle registrations and run computer checks. *Id.* He also may question a vehicle's occupants about the purpose and itinerary of their trip. *Id.* "Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made." *Brigham*, 382 F.3d at 508. "All these inquiries are within the scope of investigation attendant to the traffic stop." *Id.*

We have "reject[ed] any notion that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation." *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993); *see also United States v. Santiago*, 310 F.3d 336, 341 (5th Cir. 2002) ("[T]his court usually does not scrutinize the particular questions asked during a stop so long as they tend to relate to the purpose of the stop."). This is because "detention, not questioning, is the evil at which *Terry*'s second prong is aimed." *Shabazz*, 993 F.2d at 436. "The Fourth Amendment is concerned with ensuring that the scope of a given *detention* is reasonable under the totality of the circumstances."

*Brigham*, 382 F.3d at 508 (citing *United States v. Roberson*, 6 F.3d 1088, 1092 (5th Cir. 1993)) (emphasis in original).

Nor have our prior cases instituted a "per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions." *Id.* at 511. "Some lines of police questioning before the initiation of a computer check are often reasonable, as they may enable swift resolution of the stop." *Id.* "This is not to say," however, "that questioning is unrelated to the determination that a detention has exceeded its lawful duration." *Shabazz*, 993 F.2d at 436. Accordingly, "we have held that an officer may ask questions on subjects unrelated to the circumstances that caused the stop, *so long as* these unrelated questions do *not* extend the duration of the stop."[4] *Pack*, 612 F.3d at 350 (citing *Shabazz*, 993 F.2d at 436–37) (emphasis added); *see also United States v. Machuca-Barrera*, 261 F.3d 425, 432 n.21 (5th Cir. 2001) ("[Q]uestioning unrelated to the justification for the stop that extends the duration of the stop

---

[4] We have applied these same standards to drug-dog sniffs in the immigration checkpoint context. In upholding "the constitutionality of immigration checkpoints at which [agents routinely] stop travelers without suspicion for questioning about immigration status," the Supreme Court has explicitly limited its holding "to stops and questioning to enforce the immigration laws." *United States v. Machuca-Barrera*, 261 F.3d 425, 431 (5th Cir. 2001) (citing *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976)). "As we have stated, '[t]he Constitution [is] violated [ ] when the detention extend[s] beyond the valid reason for the initial stop,'" which, in the immigration stop context, is "determining the citizenship status of persons passing through the checkpoint." *Id.* at 432, 433 (quoting *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999), *revised on other grounds on denial of reh'g*, 203 F.3d 883 (5th Cir. 2000)). This includes "the time necessary to ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and request consent to extend the detention." *Id.* at 433. Agents are permitted to "investigate non-immigration matters beyond the permissible length of the immigration stop if and only if the initial, lawful stop creates reasonable suspicion warranting further investigation." *Id.* at 434. Much like questioning is not a detention, a drug-dog sniff is not a search, *see City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000), and it is "beyond the justifying scope of an immigration stop." *Id.* at 432 n.21. Accordingly, "border patrol agents may only conduct a drug-dog sniff if *it does not lengthen* the stop or if they obtain consent." *Id.* (emphasis added).

violates the Fourth Amendment."). Thus, for example, we found no Fourth Amendment harm when an officer asked unrelated questions of a vehicle's occupants while waiting for routine computer checks to be processed. *Shabazz*, 993 F.2d at 436–37. Viewed in a different perspective, an officer can ask unrelated questions that "extend the duration of the stop" if – but only if – the officer has reasonable suspicion sufficient to support the continued detention. *Pack*, 612 F.3d at 350.

Macias argues that Trooper Barragan's actions subsequent to the stop of the truck exceeded the limits prescribed above. Specifically, Macias contends that before Trooper Barragan ran the computer checks, he engaged in detailed questioning about matters unrelated to Macias's driver's license, his proof of insurance, the vehicle registration, or the purpose and itinerary of his trip that unreasonably prolonged the detention without developing reasonable suspicion of additional criminal activity. We agree.

Nearly eleven minutes passed from the time that Trooper Barragan stopped Macias until he ran the computer checks. During this time, Trooper Barragan questioned Macias and Zillioux extensively about the purpose and itinerary of their trip. Such questions, as discussed, are permissible because they were related in scope to Trooper Barragan's investigation of the circumstances that caused the stop. *Id.* Trooper Barragan, however, asked numerous questions that were not directed to the itinerary or purpose of Macias's trip to Victoria. Trooper Barragan asked Macias if he currently was employed, what type of work he did, whether he owned his own business, and whether he had been in "trouble" previously. Because Macias had informed Trooper Barragan that his trip to Victoria was medically-related, his job and an ambiguous question related to whether Macias had been in trouble previously had no apparent relation to the itinerary or purpose of the trip. Further, the video recording shows that Trooper Barragan asked Zillioux a series of questions

in quick succession about how long her mother and Macias had been in a relationship, whether Macias had been in trouble previously, how many children Zillioux had, who was watching her children while she was away, why her mother had not accompanied her and Macias on the trip, and for whom she, her mother, and Macias worked. Trooper Barragan admitted at the suppression hearing that these questions were unrelated to Macias's failure to wear a seatbelt, the circumstance that justified the stop in the first place. Hence, it is clear that Trooper Barragan asked numerous unrelated questions.

We next must determine if these unrelated questions impermissibly extended the duration of the stop. Approximately two minutes passed between the time Trooper Barragan initiated the stop and initially questioned Macias and Zillioux while they sat in the truck. It was not until Macias followed Trooper Barragan to the area in front of the patrol vehicle that Trooper Barragan began to ask questions unrelated to the purpose and itinerary of the stop. Nearly eight minutes elapsed from that point until Trooper Barragan ran the computer checks. Though we recognize that during this time Trooper Barragan also asked Macias and Zillioux questions related to the purpose and itinerary of the trip, Trooper Barragan extensively questioned them both on unrelated topics. These questions therefore extended the stop by some length of time. *Cf. United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993) ("We do not disagree . . . that, under appropriate circumstances, extensive questioning about matters wholly unrelated to the purpose of a routine traffic stop may violate the Fourth Amendment."). The Government presents no argument to the contrary.

The Government does argue, however, that Trooper Barragan was permitted to ask these questions because, as soon as he stopped Macias, he had reasonable suspicion that Macias was involved in criminal activity. When asked at the suppression hearing why he did not take Macias's driver's license, run the

checks, write the citation, and allow Macias to proceed on his way, Trooper Barragan stated that he asked the questions because of Macias's "[e]xtreme signs of nervousness" and demeanor. Trooper Barragan testified that his "suspicions of criminal activity taking place" were "up," and that based on his experience, Macias appeared to be unusually nervous. His signs of nervousness were manifested through avoidance of eye contact and failure to put the truck in park.

"[T]he 'touchstone of Fourth Amendment analysis is reasonableness.'" *Brigham*, 382 F.3d at 507 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch." *Jones*, 234 F.3d at 241. "We must pay heed to the Supreme Court's admonition not to treat each factor in isolation," *United States v. Lopez-Moreno*, 420 F.3d 420, 433 (5th Cir. 2005), and instead must consider "the totality of the circumstances and the collective knowledge and experience of the officer," *Estrada*, 459 F.3d at 631–32. This admonition and rule obtains because law enforcement officers are allowed "to 'draw on their own experience and specialized training' to make . . . inferences from the facts available to them." *Brigham*, 382 F.3d at 509 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Both the scope and length of the officer's detention must be reasonable in the light of the facts articulated as having created the reasonable suspicion of criminal activity. *Pack*, 612 F.3d at 357. For the scope of an officer's detention to be reasonable in the light of the facts having created the reasonable suspicion, "each crime he investigates should, if established, be reasonably likely to explain those facts." *Id.*

15

Here, the Government argues that Trooper Barragan had reasonable suspicion of criminal activity because he testified that, based on his experience, Macias appeared to be unusually nervous for someone pulled over for a seatbelt violation, as evidenced by his failure to put his truck in park and his avoidance of eye contact. Nervousness, standing alone, generally is not sufficient to support reasonable suspicion. *See Santiago*, 310 F.3d at 342. In *Brigham*, this court determined that the officer's questioning of the defendant and the vehicle's occupants before running computer checks was reasonable and effectuated the purpose of the stop because the officer learned that the defendant, the driver of the stopped vehicle, was not the lessee, that the lessee was not present among the vehicle's occupants, and that the itineraries of the occupants conflicted. *Brigham*, 382 F.3d at 508. The officer's "*increasing* suspicion was *also* fueled by Brigham's extreme nervousness, his avoidance of eye contact, and his pattern of answering the officer's questions with questions of his own." *Id.* (emphasis added). We concluded that the officer's questioning represented "a graduated response to emerging facts." *Id.* at 509. Here, Trooper Barragan could *only* point to Macias's extreme nervousness, which is not sufficient to support the extended detention.

Furthermore, potentially undercutting Trooper Barragan's reasonable suspicion is the Government's failure to present any evidence that sets out Trooper Barragan's experience. The Government stated only that "[i]t is clear that based on his experience, Trooper Barragan's suspicion was piqued after observing [Macias's] unusual nervousness . . . ." Nor did Trooper Barragan testify about his experience during the suppression hearing other than to say that he was a Texas Department of Public Safety officer. In *Brigham*, this court concluded that the officer had a right to rely on his "five and one-half years of experience with the Texas Department of Public Safety" in concluding that the defendant was lying based on the other articulable facts forming the officer's

reasonable suspicion. *Id.* at 504, 508; *see also Pack*, 612 F.3d at 361 (finding that officer's suspicion that defendant was engaged in criminal drug activity, based on defendant's extreme nervousness, conflicting stories between the occupants, and travel along a drug trafficking corridor, was entitled to "significant weight, because he had been a law enforcement officer for seventeen years"); *United States v. Grant*, 349 F.3d 192, 198–99 (5th Cir. 2003) ("Based on [the officer's] seven years of experience on the force and the totality of the circumstances he had reasonable suspicion to detain [the defendant] to search the car for drugs."). Absent "extrinsic evidence or testimony" from Trooper Barragan concerning his experience, "we are unable to evaluate the validity, basis, or intent" behind his statements that Macias appeared exceptionally nervous for someone pulled over for a seatbelt violation. *United States v. Cavitt*, 550 F.3d 430, 438 (5th Cir. 2008).

The Government argues that Trooper Barragan's suspicion also was heightened because Macias misrepresented his criminal background. Assuming, *arguendo*, that such a question was not unrelated to the purpose or itinerary of the trip, by the time that Trooper Barragan uncovered this "misrepresentation," he had already exceeded the permissible scope of the stop. Trooper Barragan asked Macias whether he had been in trouble only *after* asking a series of questions related to Macias's employment. Similarly, Trooper Barragan asked Zillioux about how long her mother had been in a relationship with Macias *before* asking whether he had been in trouble previously. Moreover, even after uncovering a possible inconsistency about "trouble" in Macias's past, Trooper Barragan seemed unconcerned, and launched into another series of questions to Zillioux concerning how many children she had, who was watching them while she was away, why Parra had not accompanied her and Macias on the trip, and the current employment status of her, Macias, and Parra. Indeed, the district court even found that Trooper Barragan "did not act on these suspicious

anomalies." The video recording of the stop further reflects that when Macias explained that he typically does not disclose the attempted murder conviction unless asked, Trooper Barragan said he understood that reasoning. And, given the broad meaning that can be ascribed the word "trouble," that Macias was not forthcoming with his prior conviction is not at all clear.[5] Even if Macias and Zillioux's answers are considered inconsistent, inconsistent stories between a driver and passenger do not necessarily constitute articulable facts of reasonable suspicion. *See Santiago*, 310 F.3d at 338–39, 342; *Jones*, 234 F.3d at 241–42.

The Government also contends that because the prior panel decision in *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006) determined that an officer's questioning of defendants on topics unrelated to the purpose and itinerary of the trip before a request for a computer check did not implicate Fourth Amendment concerns, neither should the questions asked by Trooper Barragan here. In *Estrada*, an officer questioned the two defendants about their car and travel plans before running the computer checks approximately eight minutes into the stop. *Id.* at 629. Shortly after initiating the stop and asking for identifications, registration, and insurance papers, one of the officers shined his flashlight to the area to the back of the truck's cab and bed and noticed "fresh marks" and "scratches" around the fuel tank eye piece latches and vehicle frame. *Id.* The officer, extensively trained in the classroom and by on-the-job experience – including an occasion at which he found illegal narcotics concealed in a similarly-fashioned gas tank – suspected that a false compartment or

---

[5] We note that when Trooper Barragan initially questioned Macias about any "trouble," he apparently meant convictions, since he scolded Macias for not revealing the attempted murder conviction and never clarified the meaning of "trouble" in response to Macias's question about whether imprisonment is what he meant by "trouble." When he later questioned Macias after running the computer checks, "trouble" had also come to encompass "arrests," as Macias was never convicted of marijuana possession. Accordingly, it is not unreasonable that the ambiguity inherent in the word "trouble" as used by Trooper Barragan, may have caused Macias to have omitted any mention of a marijuana arrest that did not result in a conviction.

container had been built in the fuel tank to conceal contraband. *Id.* Though not related to the purpose and itinerary of the defendants' trip, the extensive questioning about the defendants' car before the officer ran the computer checks did not violate the Fourth Amendment. *Id.* at 631. In comparison, Trooper Barragan had no articulable facts to justify extensive questioning on topics unrelated to the purpose and itinerary of Macias's trip to Victoria.

We recognize that "[n]one of the cases demands a particular series of questions be asked – or not asked – within the scope of a traffic stop." *Brigham*, 382 F.3d at 510. That, however, is only "so long as the overall detention is justified by reasonable suspicion." *Id.* Trooper Barragan asked numerous questions unrelated to the purpose and itinerary of the stop before he *may* have obtained reasonable suspicion by learning that Macias was not only nervous, but may have misrepresented his criminal past. Law enforcement must possess reasonable suspicion *before* extending a stop by asking unrelated questions. *Pack*, 612 F.3d at 350. Though "[t]here is . . . no constitutional stopwatch on traffic stops," the questions asked by Trooper Barragan were unrelated to the purpose and itinerary of the trip, and do not demonstrate that he "'diligently pursued a means of investigation that was likely to confirm or dispel [his suspicion] quickly.'" *Brigham*, 382 F.3d at 511 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). Accordingly, we must conclude that Trooper Barragan's actions subsequent to the initial stop of the truck were not reasonably related in scope to the circumstances that justified the stop of the truck, and Trooper Barragan's extended detention of Macias violated his Fourth Amendment rights.[6]

---

[6] Because we conclude that Trooper Barragan impermissibly extended the detention of Macias by asking unrelated questions in the absence of reasonable suspicion of further criminal activity, we do not reach Macias's alternative argument that Trooper Barragan impermissibly extended the duration of the stop after issuing the citations by retaining an identification document and continuing to question Macias without developing reasonable

No. 10-50614

### III.

Although we have concluded that Trooper Barragan's extended detention of Macias exceeded the scope of a permissible *Terry* stop, we must address the Government's further argument that Macias nevertheless consented to the search of the truck. "[A] subsequent consent to search may, but does not necessarily, dissipate the taint of a prior Fourth Amendment violation." *Jones*, 234 F.3d at 242 (internal quotation marks and alterations omitted). The Government's burden to prove that the defendant consented, however, "becomes all the more difficult" when there has been a prior constitutional violation. *United States v. Dortch*, 199 F.3d 193, 201 (5th Cir. 1999), *revised on other grounds on denial of reh'g*, 203 F.3d 883 (5th Cir. 2000).

When we analyze consent given after an unconstitutional detention, a two-pronged inquiry is applied: (1) whether the consent was voluntarily and freely given; and (2) whether the consent was an independent act of free will. *Jones*, 234 F.3d at 242. "The first prong focuses on coercion, the second on causal connection with the constitutional violation." *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993). We have made clear that affirmance for the Government on such consent as here is appropriate only if *both* questions are answered favorable to it: "Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will." *Id.* at 127–28. Furthermore, the Government "has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *Jones*, 234 F.3d at 242 (internal quotation marks omitted). We review the district court's determination that consent was voluntary for clear error. *Estrada*, 459 F.3d at 634.

---

suspicion of additional criminal activity.

No. 10-50614

The first inquiry, whether consent was voluntarily and freely given, requires that we examine six factors: "1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found." *Jones*, 234 F.3d at 242. In this analysis, no single factor is determinative. *Id.*

Here, the district court applied the six factors and determined that Macias's consent was voluntary. Macias argues that his consent was "not voluntary" and that "[m]any of the factors that show a lack of attenuation also demonstrate that the district court clearly erred in concluding that Macias gave voluntary consent to search the truck." He neither cites nor analyzes the six-factor test to evaluate the voluntariness of consent, however. Given his failure to cite the six factors, much less specifically apply them, we are doubtful that he has preserved the argument. *See Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993) ("FED. R. APP. P. 28(a)(4) requires that the appellant's argument contain the reasons he deserves the requested relief with citation to the authorities, statutes and parts of the record relied on." (internal quotation marks omitted)). This failure, however, is not fatal to Macias's overall contention that the firearm should be suppressed under the fruit of the poisonous tree doctrine because it is clear to us that Macias's consent was too closely connected to the unconstitutional detention to be deemed an independent act of free will. *See Jones*, 234 F.3d at 234, 243 (declining to decide whether consent was voluntarily provided because it was "clear that the government failed to prove that the consent was an independent act of free will").

To determine whether consent was an independent act of free will and, thus, broke the causal chain between the consent and the illegal detention, we are guided by three factors: 1) the temporal proximity of the illegal conduct and

21

the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." *Id.* at 243. Again, no single factor is determinative.

Macias argues that he gave consent almost immediately following the illegal detention, and that there were no intervening events. Indeed, he appears to argue that he was still being detained at the time he provided consent. Macias points out, for instance, that when he attempted to turn his attention to Zillioux in the car, Trooper Barragan "ordered him to stop, and required him to remain to answer questions." He further asserts that Trooper Barragan's actions were for the purpose of discovering evidence. The Government makes no specific response to any of these arguments; instead, it rests primarily on its argument that the detention was supported by reasonable suspicion and that the district court's finding of voluntary consent was not clearly erroneous. Although the district court found that Macias's consent was voluntary, it did not make a specific finding on whether his consent was an independent act of free will, other than to state in its oral ruling that "[t]he consent to search the vehicle was given voluntarily by the Defendant and did not overcome Defendant's free will, looking at the six factors in the totality of the circumstances."

To address the first factor – the temporal proximity of the illegal conduct and consent – we must determine when the impermissible detention came to an end. After explaining and having Macias sign the citations, Trooper Barragan handed to Macias the citation, its accompanying letter, and his driver's license. He then asked Macias if he could ask him a few more questions. Macias said "Okay," and then Trooper Barragan proceeded to question Macias *while still holding* Zillioux's identification card. It was not until after he asked Macias when was the last time he used marijuana, that he handed over Zillioux's identification card. The Government argues that a reasonable person would have felt free to leave when Trooper Barragan returned Macias's driver's license

22

and the citations. We disagree. At the *earliest*, the detention ended when Trooper Barragan gave Zillioux's identification card to Macias. *Cf. Jones*, 234 F.3d at 241 (concluding that officer extended detention by, among other things, returning the passenger's identification but retaining other documents, including the driver's identification). Only thirty seconds separated Trooper Barragan returning Zillioux's identification card and requesting permission to search the truck. It is clear then that there was a close temporal proximity between the end of the illegal detention, at its earliest, and Macias's consent. *Cf. id.* (determining that consent was not an independent act of free will because it was given when officer was still holding driver's identification); *Chavez-Villarreal*, 3 F.3d at 128 (stating that consent was not an independent act of free will because it was provided while officer was still holding green cards belonging to the passenger and driver).

The second factor also indicates that Macias's consent was not independent of his illegal detention. The Government has identified no intervening circumstances. Indeed, we can find no circumstances that intervened between the detention and the consent, and thus hold that "there is no reason to think that [Macias] believed he was free to go during" the thirty second interval separating the two. *See Dortch*, 199 F.3d at 202. In that thirty seconds, Trooper Barragan managed to ask rapid-fire questions about possible contraband in the truck before requesting consent. A reasonable person, having not been told he was free to leave and being asked such questions in a challenging tone, would not have felt free to leave. With respect to the third factor, although Trooper Barragan's subjective purpose is not obvious, it is clear that the purpose of the continuing detention was to obtain consent to search the vehicle for the possibility of finding contraband of any sort.

In sum, even assuming that Macias's consent was voluntarily given, and that the district court's finding on that issue was not clearly erroneous, the

consent was nevertheless not valid. Instead, the causal chain between the illegal detention and Macias's consent to Trooper Barragan was not broken, and therefore the search was nonconsensual. And because there was no valid consent to search the truck, the firearm and all other evidence located during the search should have been suppressed.

## IV.

In conclusion, we hold that the search of the truck violates the Fourth Amendment, and that all evidence resulting from that search must be suppressed. Trooper Barragan exceeded the scope of the stop by extensively questioning Macias and Zillioux on matters unrelated to the purpose and itinerary of their trip. He thus unconstitutionally prolonged the detention beyond the time necessary to investigate the circumstances that justified the stop. Moreover, there was no reasonable suspicion of additional criminal activity that would justify such a prolonged detention. We further hold that even if Macias's actual consent was voluntary, such consent was not an independent act of free will. Because all evidence of the search is thus suppressed, and there being no other inculpatory evidence sufficient to convict Macias of being a felon in possession of a firearm, the judgment of conviction is REVERSED and VACATED, and the case is REMANDED for entry of a judgment of acquittal.

REVERSED, VACATED, and REMANDED.