WALTERS, J.,
dissenting.
This case begins with a conceded violation of the Oregon Constitution and ends without legal consequence. That is wrong, and, respectfully, I dissent.
Until today, like courts throughout this nation,[1] this court recognized that, when a police officer violates the constitution and then, while the constitutional violation is ongoing, obtains a defendant’s voluntary consent to search, the constitutional violation has a causal connection to the consent and the resulting evidence must be suppressed unless the state proves other intervening or mitigating facts. State v. Ayles, 348 Or 622, 636, 237 P3d 805 (2010); State v. Rodgers/Kirkeby, 347 Or 610, 628-29, 227 P3d 695 (2010); State v. Hall, 339 Or 7, 27, 115 P3d 908 (2005); State v. Olson, 287 Or 157, 166, 598 P2d 670 (1979). From today, when a police officer violates the Oregon Constitution, a court no longer must presume that the officer gains an advantage, and the state no longer has the burden to prove that the evidence that the officer obtains by pressing that advantage should be admitted.
I concede that the majority does not acknowledge those fundamental shifts. In fact, the majority specifically *104 disavows them when it disputes the dissents’ suggestion that “we have modified the Hall analysis to remove the presumption that a consent search following unlawful police conduct is ‘tainted,’” 356 Or at 84, and insists that the burden of establishing the admissibility of evidence produced as a result of such a consent search remains with the state. 356 Or at 88. But if the presumption held and the burden stayed put, the majority could not decide this case the way that it does.
It is when the majority applies the principles that it articulates that the majority reveals the extent to which it “refines” prior law. In describing the officers’ unconstitutional conduct in this case, the majority writes that “nothing about the limited nature of the unlawful conduct, or the purpose or flagrancy of the conduct, suggests that it caused defendant to consent to the search.” 356 Or at 92. If the majority had presumed that the officers’ illegality and defendant’s consent to search were causally connected, the majority— like courts throughout the nation and like the Oregon courts that decided the cases cited above — would have been required to move to the next step in the analysis and consider whether the state had proved intervening or mitigating facts that would permit the admission of the evidence. And, had the majority moved to that step, it would have been compelled to concede that the state had not proved such facts.
In its application of the principles that it articulates, the majority neither presumes a causal connection between the police illegality and defendant’s consent to search nor rests its decision on the state’s proof of intervening or mitigating facts. Rather, the majority dispenses with the presumption by declaring that “mere but-for causation is insufficient to justify suppression of the evidence, even in the absence of intervening or mitigating circumstances.” Id. In so declaring, the majority not only disregards the advantage that an officer commands when engaged in a continuing constitutional violation, the majority also ignores this court’s holding in Ayles that there is nothing “mere” about the motivating effect of such an advantage:
“[A] defendant establishes a more substantial connection than merely one thing occurring after another when that *105 defendant establishes that he or she consented to a search during an unlawful detention. In such a circumstance, the fact that the defendant is not legally free to leave because of the illegal police activity cannot be discounted in motivating the defendant’s consent, and therefore, such illegal police conduct normally will be at least minimally connected to the defendant’s decision to consent.”
348 Or at 634 (emphasis in original).
Moreover, by ignoring the causal connection that exists when officers use unconstitutional means to seek and obtain consent to search, the majority effectively shifts the burden of proof to the defendant. Instead of requiring the state to prove that the evidence that the officers obtained did not derive from their unconstitutional acts by proving intervening or mitigating circumstances, the majority requires the defendant to prove facts in addition to the police illegality to demonstrate the necessary causal connection. Thus, the majority relies on the fact that defendant “does not argue that anything about the nature of the trespass or his interactions with the detectives significantly affected his consent.” 356 Or at 92. If the burden remained with the state, then the majority would have identified the evidence that the state had adduced to demonstrate that defendant’s consent to search was unrelated to the fact that uniformed officers had come onto his property, into his backyard and up to his sliding glass bedroom door, woken him from sleep, and, pressing that unconstitutional advantage, requested his consent to search.
Why the unacknowledged change in the presumption and the burden? The majority does not dispute that, when an individual is “subject to police authority in excess of constitutional bounds,” the individual is “placed at a disadvantage relative to the constitutional position that he or she would have occupied in the absence of the illegal police interference.” 356 Or at 73. The majority concedes that “every police illegality places an individual in a worse position than if no illegality had occurred[.]” 356 Or at 82. And, the majority recognizes that the purpose of the exclusionary rule is to restore defendants to the same position that they would have occupied if “the government’s officers had stayed *106 within the law.” Hall, 339 Or at 24; State v. Davis, 295 Or 227, 234, 666 P2d 802 (1983).
As the reason for the changes that it implements, the majority states that “the exploitation test announced in Hall does not account sufficiently for the importance of a defendant’s voluntary consent to search.” 356 Or at 77. The reason, the majority explains, is that “[o]ur cases demonstrate that, in some situations, a defendant’s voluntary consent itself may be sufficient to demonstrate that the unlawful conduct did not affect or had only a tenuous connection to the evidence produced.” 356 Or at 77-78. True enough, but the cited cases — State v. Rodriguez, 317 Or 27, 854 P2d 399 (1993), and State v. Kennedy, 290 Or 493, 624 P2d 99 (1981)[2] — are the same cases that the state relied on in Hall and that the court found unconvincing. The court explained in Hall that, in Rodriguez and Kennedy, the officers did not engage in illegal conduct and then, pressing their advantage, politely ask for consent to search. There were intervening, mitigating facts: In those cases, before the police sought consent to search, the defendants had “volunteered to allow the search without any police prompting,” and, in Kennedy, the police also provided the defendant with Miranda warnings. Hall, 339 Or at 34. Thus, under Hall, Rodriguez, and Kennedy, the state was required to prove intervening or mitigating facts, other than tainted consent, to establish the admissibility of the evidence that the officers discovered.
The majority acknowledges as much when it states that “Hall could be read as effectively having created a per se rule that evidence gained from a requested consent search always must be suppressed if that request occurs in close temporal proximity to the illegal stop and no intervening or mitigating circumstances exist.” 356 Or at 78 (emphasis added). The majority is correct in that understanding of Hall. The majority is wrong when, later in its opinion, it cites Hall for the proposition that “mere but-for causation is insufficient to justify suppression of the evidence [.]” 356 Or *107 at 92. Both interpretations of Hall cannot be correct, and only the former justifies the result that the court reached in Hall and applied thereafter.
The majority is correct that, in Hall, the court stated that
“this court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained ‘but for’ unlawful police conduct.”
339 Or at 25. However, the majority fails to point out that the court then went on to explain what it meant by that statement: that, although a defendant establishes a causal connection sufficient to result in suppression when the defendant establishes a but-for relationship between an unconstitutional act and the evidence to be suppressed, the state may prove to the contrary:
“[A]fter a defendant establishes the existence of a minimal factual nexus — that is, at minimum, the existence of a ‘but for’ relationship — between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant’s rights under Article I, section 9, see, e.g., Johnson, 335 Or at 522-26 (discussing principle); (2) the police obtained the disputed evidence independently of the violation of the defendant’s rights under Article I, section 9; see, e.g., Smith, 327 Or at 379-80 (discussing principle); or (3) the preceding violation of the defendant’s rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence, see, e.g., State v. Jones, 248 Or 428, 433-34, 435 P2d 317 (1967) (discussing principle).”
Id. (emphasis added). It is the third means by which the state may fulfill its burden to demonstrate that the evidence did not derive from the preceding illegality on which the *108 majority hangs its hat — that the violation “has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence.” Id. But, again, the majority makes more of that hook than it can hold.
In Hall, the court cited State v. Jones, 248 Or 428, 435 P2d 317 (1967), as discussing the principle on which the majority relies. In Jones, the court had observed that a causal link between an unconstitutional act and resulting evidence may be too tenuous to require suppression when intervening events or circumstances — such as a legal arrest or the passage of time — break the causal chain. Id. at 434. In Hall, the court reasoned that, when such a break occurs, the admission of the challenged evidence
“does not offend Article I, section 9, because the defendant has not been disadvantaged as a result of the unlawful police conduct, or, stated differently, because the defendant is not placed in a worse position than if the governmental officers had acted within the bounds of the law.”
339 Or at 25.
Hall and this court’s decisions since Hall make clear that, when the police engage in unconstitutional conduct that gives them an advantage and thereby obtain consent to search, the resulting evidence must be suppressed to restore the defendant to the position the defendant would have occupied had the police acted within the bounds of the law. As is evident from those cases, the defendant’s consent results from the unconstitutional act — it is a continuation of that act and not a break in the causal chain. The court explained why that is so in Ayles:
“A defendant gains nothing from having a constitutional right not to be seized if the police can seize him and — by definition — use the circumstance of that seizure as a guarantee of an opportunity to ask him to further surrender his liberty.”
348 Or at 631. Thus, in Ayles, Rodgers/Kirkeby, and Hall, once the defendants established that officers had used the advantage afforded by their unconstitutional acts to obtain consent to search, the evidence that the officers obtained as a result was suppressed.
*109 In reaching a contrary result in this case, the majority does far more than merely “refine” the Hall analysis and add factors for a court’s consideration: It changes its focus completely. The majority notes, unremarkably, that, if an officer’s conduct is “intrusive, extended, or severe, it is more likely to influence improperly a defendant’s consent to search.” 356 Or at 81. The majority then reasons from the dissent in Ayles that, “where the nature and severity of the violation is limited, so too may be the extent to which the defendant’s consent is ‘tainted’” and that “the degree of attenuation necessary to purge the taint is correspondingly reduced.” Id. (citing Ayles, 348 Or at 654 (Kistler, J., dissenting)). The majority also engrafts federal considerations of “purpose” and “flagrancy” into the Oregon constitutional analysis. The majority reasons that particularly flagrant conduct is “more likely to affect the defendant’s decision to consent than more restrained behavior [,]” 356 Or at 82, and that purposeful police conduct may be “relevant both to understanding the nature of the misconduct and, ultimately, to deciding whether the police exploited that misconduct to obtain consent to search.” 356 Or at 83.
Certainly more intrusive, extended, severe, flagrant, or purposeful unconstitutional conduct may have a greater effect on a defendant’s decision to consent, but that does not mean that other unconstitutional conduct has none. What the majority refuses to confront openly is that, until today, the state was required to prove some intervening or mitigating circumstance other than a tainted consent to obtain admission of illegally obtained evidence.
To reach its conclusion that a court need not suppress the evidence that officers gain when they engage in unconstitutional conduct and simultaneously seek and obtain consent to search, the majority must overrule one of two holdings: (1) the holdings in Hall, Rodgers/Kirkeby, and Ayles that an ongoing constitutional violation significantly affects and is causally related to a defendant’s simultaneous consent to search; or (2) the holdings in those cases that, when such a causal connection exists, the constitutional violation — whatever its nature or severity — requires suppression. If it overrules the former, then the majority *110 disregards the advantage that officers obtain when they seek consent during the course of a constitutional violation. If it overrules the latter, then the majority determines by the attachment of adjectives which constitutional violations will be vindicated and which will not.
The fact that the majority explicitly overrules neither is itself troubling. In Farmers Ins. Co. v. Mowry, 350 Or 686, 261 P3d 1 (2011), the court decided not to overrule a prior decision because
“[w]e assume that fully considered prior cases were correctly decided, and defendant raises no argument that was not rejected by the majority in [the prior decision]. As such, there is no principled reason for this court to overrule [that decision] on the ground that the majority was wrong. *** [J]udicial fashion or personal policy preference are not sufficient grounds to reverse well established precedent.”
Mowry, 350 Or at 700 (citations omitted). Similarly here, the state raises no argument that was not rejected by the majority in Hall, Rodgers/Kirkeby, and Ayles. I see no principled reason for this court to overrule those cases or to decide, without explicitly overruling them, that the new rule that it articulates is an improvement on the old. And I do not see the new rule as an improvement. The rule that a continuing unconstitutional act creates an advantage that requires suppression absent proof of intervening or mitigating facts was clear and workable, and the majority does not mount a case to the contrary.
It may seem “reasonable,” in a constitutional sense, to permit officers to enter the backyard of a home, knock at a bedroom door, and seek consent to enter when the officers suspect drug activity and are concerned about the welfare of children inside the home. Courts with that view have reasoned that the officers do not violate the constitution when, pursuing a lawful objective, they walk to the back door of a residence after receiving no response at the front. See, e.g., United States v. Perea-Rey, 680 F3d 1179, 1187-88 (9th Cir 2012) (“[I]t remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer’s actions are consistent with an attempt to initiate consensual *111 contact with the occupants of the home. Officers conducting a knock and talk also need not approach only a specific door if there are multiple doors accessible to the public.”); United States v. Raines, 243 F3d 419, 421 (8th Cir 2001) (“[L]aw enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence.”). Under those courts’ precedents, therefore, the actions in which the officers engaged in this case would not violate the constitution, and thus evidence obtained by those actions would be admissible.
But that is not what the majority decides here. The majority accepts the state’s concession that the officers acted unreasonably and violated defendant’s Article I, section 9, rights when they moved beyond his front door and entered his property. The majority then holds that it will impose no consequence for that violation. The majority refuses to restore defendant to the position that he would have occupied if “the government’s officers had stayed within the law.” Davis, 295 Or at 234. What that means is that officers may violate the constitution without consequence in this and other circumstances in the future and, consequently, that the state may benefit from the officers’ constitutional violations. The only apparent restriction imposed by the majority is that a court may decide, after the fact, that the conduct of the officers was so severe, purposeful, or flagrant that, in the court’s opinion, suppression must follow. But how can the police or the public know before the fact which adjective a court will attach? And, more importantly, by what measure will this court determine the “degree” of the constitutional violation?
If an officer’s acts are “reasonable,” then, perhaps, they do not violate the constitution. But if the officer’s acts do violate the constitution, they cannot be deemed “reasonable” in any sense of that word.[3] Courts, understandably, *112 wish to hold criminals accountable for their crimes. But the majority’s new rule removes a solid brick from the constitutional wall that prohibits the state from benefitting from its illegality. See Davis, 295 Or at 233-34 (“The object of denying the government the fruits of its transgression against the person whose rights it has invaded is not to preserve the self-regard of judges but to preserve that person’s rights to the same extent as if the government’s officers had stayed within the law.”).[4]
*113 This case illustrates the significance of the change that the majority has engineered. In this case, as the state concedes, the court must adhere to a century of jurisprudence and acknowledge that the officers violated defendant’s Article I, section 9, rights when they entered his backyard. But under the majority’s rule, the court need not engage in the analysis necessary to overrule that precedent; rather, it may describe the violation as “limited” and thereby permit it.
This court has an obligation to demonstrate to the people of Oregon that our constitution is enduring: That it is made of sterner stuff than four votes represent; that it can withstand the forces of the day that call, always call, for understanding and flexibility to permit the government to act. Surely government must act; but when it violates the constitution in doing so, it should not benefit.
I respectfully dissent.
Baldwin, J., joins in this opinion.

 See, e.g., United States v. Macias, 658 F3d 509, 524 (5th Cir 2011) (suppressing evidence from voluntary consent obtained during illegal extension of traffic stop); United States v. Washington, 490 F3d 765, 777 (9th Cir 2007) (where consent obtained immediately after illegal seizure, without any “appreciable intervening circumstances,” evidence must be suppressed); United States v. Lopez-Arias, 344 F3d 623, 630 (6th Cir 2003) (suppressing evidence obtained during consent search when consent obtained during illegal arrest); United States v. Vasquez, 638 F2d 507, 527-29 (2d Cir 1980), cert den, 450 US 970 (1981) (consequence of “an illegal entry is to make unlawful any ensuing interrogations or searches,” and “suppression is required * * * unless the taint of the initial entry has been dissipated before the ‘consents’ to search were given”); Commonwealth v. Swanson, 56 Mass App Ct 459, 463-64, 778 NE2d 958 (2002) (“evidence [obtained after the illegal entry] must be disregarded in assessing the lawfulness of the search”); In re Ashley W., 284 Neb 424, 444, 821 NW2d 706 (2012) (ordering suppression of evidence derived from consent search made during unlawful stop).

 The majority also cites State v. Williamson, 307 Or 621, 772 P2d 404 (1989), in which police officers had traded on evidence that they had only by virtue of their illegality. The evidence was not admitted: “[T]he officers *** were trading on evidence that they had only by virtue of the unlawful roadblock. That is a far cry from Kennedy.” Id. at 626.

 With respect, the concurrence mistakes the focus of the inquiry. Citing the dissent in Hall, Justice Landau asks: “If a defendant has, in fact, voluntarily consented to the search, why should the courts not vindicate that decision?” 356 Or at 95 (Landau, J., concurring). He expresses doubt about whether police misconduct may “deprive!] subsequent consent of its force!,]” id., and joins the majority “which gives greater attention to the role of a defendant’s consent to a warrant-less search.” Id. at 103.
The issue that we confront is not whether a defendant’s consent obviates the need for a warrant, is valid, or has “force.” If officers obtain voluntary consent *112 to search, the consent is valid and effective in the sense that the officers do not violate the constitution when they search pursuant to the consent and without a warrant. In that sense, the ensuing search is reasonable and constitutional. But that does not answer the question of the consequence that flows from the preceding unconstitutional and admittedly unreasonable act — in this case, the illegal entry.
We know from the majority opinion in this case, adhering to prior cases, that, when officers illegally stop a car, see contraband that they would not have seen had they acted within constitutional bounds, and seek and obtain the defendant’s voluntary consent to search, the officers exploit their illegal seizure and the evidence must be suppressed. 356 Or at 86. That is so, even though the consent was valid and of force in the sense that the officers did not violate the constitution when they searched pursuant to the consent and without a warrant. The evidence is suppressed not because the officers searched without valid consent; rather, it is suppressed because the officers stopped and seized the defendant illegally. That illegal seizure gave the officers an advantage — the vantage that allowed them to see the contraband — and they used that advantage to seek consent to search. Suppression is required to restore the defendant to the position that the defendant would have held had the officers acted constitutionally.
My point is that it is not the validity of a defendant’s consent that is an issue in an exploitation analysis. Instead, the issue is the consequence that a court will impose when officers obtain, by unconstitutional acts, an advantage that they would not have held had they remained within the law.

 I do not see Justice Landau as arguing that that brick should remain in place and be supported by a second brick of deterrence. Justice Landau considers “the idea” of tainted consent to be “something of a fiction.” 356 Or at 95 (Landau, J., concurring). The reason, I think, is that he is not convinced that, when officers engage in unconstitutional acts, those acts have an “actual” effect on a defendant’s decision to respond affirmatively when the officers ask for consent to search. But it is not only the concern that an unconstitutional act may serve as a motivating force that underlies this court’s “personal rights” jurisprudence. Until today, this court has recognized that, when officers engage in unconstitutional acts, those acts place them at an advantage and enable them to seek consent that they otherwise could not obtain. Consequently, the evidence that the officers obtain must be suppressed unless the state can show that the officers inevitably or independently would have obtained or did obtain the same evidence or that intervening or mitigating circumstances demonstrate that the illegality was not the source of the evidence. That “personal rights” rule is simply a rule that the state may not retain the benefit of its illegal conduct and that the defendant must be returned to the status quo ante. Justice Landau does not expressly reject that *113 view. However, because Justice Landau votes with the majority, I do not think that he endorses it.
If what Justice Landau suggests by arguing for deterrence as a rationale for the exclusionary rule is that there are some continuing constitutional violations that require suppression and some that do not, based on whether deterrence is warranted, I disagree. How we draw such lines, other than purely subjectively, is a mystery to me. For instance, as I point out in note 3, when officers violate the constitution, see evidence, and then seek consent to search, we suppress the evidence that they obtain in their search, but when the officers violate the constitution and do not see evidence until after they obtain consent to search, we do not. I do not see how adding a deterrence rationale will allow us to better articulate a constitutional basis for that distinction or better “vindicate a defendant’s right to be free from unreasonable search and seizure” — our goal as the majority states it. 356 Or at 73.