United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 8, 2006**

Charles R. Fulbruge III
Clerk

In the
# United States Court of Appeals
## for the Fifth Circuit

———————

m 05-41042

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

RAMIRO SALAICES ESTRADA,

Defendant-Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

———————

m 05-41089

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JORGE MANUEL ESTRADA,

Defendant-Appellant.

Appeals from the United States District Court
for the Southern District of Texas

Before SMITH and STEWART, Circuit Judges,
   and HANEN,[*] District Judge.

JERRY E. SMITH, Circuit Judge:

Ramiro Estrada ("Ramiro") and his brother Jorge Estrada ("Jorge") were charged with aiding and abetting the possession of 68 kilograms of marihuana with intent to distribute. They entered into conditional guilty pleas, reserving the right to appeal the denial of their motions to suppress. We affirm.

I.

On November 13, 2004, Ramiro and Jorge were returning from Zacatecas, Mexico, in Ramiro's 1989 Chevy. The vehicle was stopped at approximately 12:08 a.m. on I-10 by trooper Sergio Villarreal and sergeant Gary Chandler. The video recording of the traffic stop shows that about one minute after the stop, Villarreal approached the vehicle and read the license plate number for the computer check. The driver, Jorge, was told that he was stopped for having a defective rear license plate lamp in violation of TEX. TRANSP. CODE ANN. § 547.322 (Vernon 1995).

Villarreal asked for identification of the driver and passenger and for registration and insurance papers. At the same time, he shined his flashlight onto the front windshield for the

[*] District Judge of the Southern District of Texas, sitting by designation.

vehicle identification number and then quickly flashed the back of the truck cab as he began to review the paperwork. At 12:11, Villarreal told Jorge that he would give him a warning for the defective lamp, then asked him to step outside the vehicle. Villarreal went back to Ramiro, who was still in the passenger seat. He questioned him about the car and his travel plans. Ramiro told him, among other things, that he has owned the car for about a month.

At 12:13, Villarreal walked to the back of the truck and, on his way, shined his flashlight to the area to the back of the truck's cab and bed. At this time he saw "fresh marks" and "scratches" around the fuel tank eye piece latches and vehicle frame. He explained that the "eye piece latches" were devices holding the tank to the truck frame and that he noticed that they were topped by a hardened adhesive material.

At that time, he thought the marks were "out of the ordinary": They were short, no more than three inches in width, indicating that the metal strap to the fuel tank had been recently "removed or tampered with." He described the adhesive material as "hardened," "discolored," and with a consistency much like "J-B Weld" or "Bondo-type" material.

Villareal further explained that the material was the type of substance used for filling or repairing holes during automotive repair and

that, based on his extensive classroom training and on-the-job experience, including an occasion at which he had found illegal narcotics concealed in a gas tank in similar fashion, he suspected that a false compartment or a container had been built into the fuel tank to conceal contraband. Villarreal indicated that contraband is concealed in fuel tanks after an opening is cut into the tank. Adhesive material is typically used to cover newly created compartments to prevent seepage of fuel and contraband.

The videotape shows that next Villarreal pointed to the license plate and showed Jorge that the lights did not work and told him that he would give him a warning. At 12:14, he pulled Jorge away from the vehicle and to the edge of the road and asked him similar questions and also whether any repairs had been done on the truck. Jorge advised that Ramiro had had the truck for about three months, Jorge did not know of any repairs.

At 12:16, Villarreal walked back to the DPS car and told Chandler that "the story is about the same, they have been in Zacatecas (Mexico), they have traveled about 15 hours, they are carpet layers, but Ramiro indicated he bought the vehicle in October 2004 and his brother stated he had bought it 3 months ago." He also noted that he saw "a strap across the gas tank, with a slit, which turns to lock, and it looks like it has been turned recently." While Villarreal was talking to Chandler, the computer check on the defendants' criminal history (which was requested only about eight minutes into the stop) came back negative at 12:18.

Villarreal walked back to Jorge, who was standing by the side of the road, and began a new inquiry. Villarreal asked Jorge a series of questions, including whether he had had any problems with the gas tank. After receiving the answers, Villarreal went to the passenger, Ramiro, and asked him a set of similar questions.

At 12:22, Villarreal asked Ramiro to get out of the truck, then proceeded to ask him another series of questions. At 12:23, Villarreal asked Ramiro in Spanish for permission to "inspect" the truck, and Ramiro agreed. Then he also obtained permission, in Spanish, from Jorge. Villarreal testified at the suppression hearing that the demeanor of the defendants was one of calmness.

Villarreal began to search by going to the driver's side and viewing the back of the cab. He flashed his light again and stated, "See where the black strap comes out, it has rust but I see a lighter mark, like the strap has been moved." Then, he looked under the vehicle at the gas tank. He knocked on the tank, which produced a hollow sound. When Villarreal went to the passenger side of the tank, he stated, "There's a bump on top and it looks like a J-B weld on the tank but its hard to tell how fresh it is. It has scratch marks and I see a light blue color but it could be from wear and tear, I don't know."

Villarreal testified that he saw "fresh scratch marks" and more adhesive material along a ridge of the gas tank. He also observed that the bolts used to hold the straps to the frame of the truck were not the same size and were loose. It appeared that the bolts had been removed and replaced without being tightened, so they were flush with the bed of the truck.

The tape next shows (22 minutes and 57 seconds after the stop) that Villarreal stated that he was going to call "Schulenberg P.D. to

see if they have a scope and density meter." Sergeant Koehne with the Schulenberg police department arrived on the scene approximately one hour after the initial stop. After assembling the scope and inserting it into the gas tank, Koehne and Villarreal identified that the tank had a green wall, inconsistent with the rest of the tank.

By 1:30., Koehne identified several walls that could serve as compartments, and Koehne and Villarreal decided to bring down the tank. At 1:45, Villarreal began to call garages for the dropping of the tank. He located a garage at 1:54.

At about 2:00, Villarreal told both defendants that they were not under arrest but were merely detained, and handcuffed them and seated them in the DPS vehicle. The defendants and the Chevy truck were driven to the garage, where they arrived at 2:27, whereupon the work began to drop the tank. The marihuana was found, and at that point, about three hours after the initial stop, Villarreal told the defendants they were under arrest and read them their *Miranda* rights.

## II.

Following a hearing, Ramiro and Jorge entered conditional guilty pleas, reserving the right to appeal the rulings on the motions to suppress. On appeal, they do not challenge the validity of the stop, but only its duration and scope and the voluntariness of the consent to search.

## III.

In assessing whether there was reasonable suspicion, we review the district court's findings of fact for clear error and its determination of reasonable suspicion *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996).

We view the evidence introduced at a suppression hearing in the light most favorable to the prevailing party. *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999).

A routine traffic stop is a limited seizure that closely resembles an investigative detention as was addressed in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir.1993). Accordingly, the *Terry* framework is used to analyze cases in which motorists are stopped for violating traffic laws. *Id.* The Estradas concede that the initial stop was a valid traffic stop for driving with a defective light. They aver, however, that Villarreal exceeded the scope of that stop when he continued to question them after he received the results of the criminal background check at 12:18. *See United States v. Dortch*, 199 F.3d 193, 198-99 (5th Cir. 1999).

Once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts. *United States v. Machuca-Barrera*, 261 F.3d 425, 434 (5th Cir. 2001); *Shabazz*, 993 F.2d at 436. This is because a detention must be temporary and last no longer than is necessary to effect the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges. *Dortch*, 199 F.3d at 200. Mere "uneasy feelings" and inconsistent stories between a driver and a passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking. *See United States v. Santiago*, 310 F.3d 336, 338-39 (5th Cir. 2002).

To the extent that the Estradas argue that the length of the stop was unreasonable before 12:18, that argument is foreclosed by *United*

4

*States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). In a valid traffic stop, an officer may request a driver's license and vehicle registration and run a computer check thereon. *Brigham*, 382 F.3d at 508.

As the district court correctly determined, Villarreal's questioning of Ramiro and Jorge before Villarreal's request for a computer check about eight minutes into the stop does not implicate Fourth Amendment concerns. As *Brigham* explained, "neither our prior cases nor any other caselaw . . . institutes a per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions." *Brigham*, 382 F.3d at 511.[1] Even questions unrelated to the reason for the stop do not, in themselves, constitute a Fourth Amendment violation.[2]

Therefore, the registration and license check, as well as the questions that Villarreal asked the brothers within the first ten minutes of the stop before, and while waiting for, the computer results did not violate the Fourth Amendment. Under *Brigham*, the purpose of the initial stop ended at 12:18, when the results of the criminal background check came back negative, unless the officers formed additional reasonable suspicion before that time.

Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure. *Santiago*, 310 F.3d at 340. The determination of whether Villarreal had developed a reasonable suspicion must be made based on the totality of the circumstances and the collective knowledge and experience of the officer or officers. *See Jones*, 234 F.3d at 241.

Reasonable suspicion does not arise solely from the inconsistent answers regarding the length of Ramiro's ownership of the truck. This case, however, is distinguishable from *Dortch*, *Santiago* and *Jones*, because in those cases there were no physical facts suggesting the presence of a hidden compartment. In contrast, in this case there was significant physical evidence that, taken together with the officer's training and experience, gave rise to reasonable suspicion.

As we have recounted, the videotape shows that at 12:13, Villarreal directed his flashlight to the area from the passenger's side to the back of the truck's cab and bed. He testified at the suppression hearing that at that time, he saw "fresh marks" and "scratches" around the fuel tank eye piece latches and vehicle frame; which were "out of the ordinary" and showed the presence of an adhesive material and suggested that the gas tank had been tampered with. Based on his extensive classroom training and on-the-job experience, including an occasion at which he found illegal narcotics concealed in a gas tank in similar fashion, he suspected that a false compartment or container was built into the fuel tank to conceal contraband. Adhesive material is typically used to cover newly created compartments to prevent seepage of fuel and contraband.

---

[1] *See also Brigham*, 382 F.3d at 509 ("Finally, this process, from the time Trooper Conklin started questioning Brigham until he returned to his patrol car to check the registration and I.D.'s provided by Brigham and the others, lasted only seven minutes. Conklin's questioning exemplified a graduated response to emerging facts.").

[2] *Id.* at 508 & nn.5-6 ("'[D]etention, not questioning, is the evil at which *Terry*'s second prong is aimed.'") (citation omitted).

Defendants assert that Villareal could not have seen the scratch marks and the adhesive at 12:13, because he admitted at the suppression hearing that this happened later, after he asked for consent to search the car, at 12:23. We disagree.

In the testimony to which defendants point, Villareal testified only that he looked below the car later, not that he did not see the scratch marks until later. He indicated that at the point when he flashed his flashlight to the area to the back of the truck cab and the truck bed (12:13), he saw scratches and a discolored substance that he thought was adhesive that is used for creating hidden compartments in the gas tanks to conceal contraband. Furthermore, Villarreal's testimony that he saw adhesive and scratch marks (indicating that the gas tank has been tampered with) is not merely convenient *ex post* testimony by Villarreal; the videotape's audio shows that he told Chandler before 12:18, at about 12:16, that there was a strap across the gas tank, with a slit, that turns to lock, and it looked like it has been turned recently.

These facts, taken together with the officers' experience, and seen from the totality of the circumstances, including the fact that the vehicle had recently crossed from Mexico, "a common origin of illicit drugs,"[3] suggest that there was a reasonable likelihood that the vehicle's gas tank had a hidden compartment that was meant to transport drugs.

The facts here do not reflect a mere customization of the vehicle that could also support a conclusion of innocent travel. Rather, Villarreal's expert experience conforms with common sense: It is hard to conceive of a legiti-mate use for a large hidden storage compartment in any part of a vehicle, let alone in the gas tank.

Courts must allow law enforcement "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks and citation omitted). The adhesive marks and other scratches, together with the other evidence, do not fully exclude the possibility of innocent travel given the age of the vehicle,[4] but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. *United States v. Sokolow,* 490 U.S. 1, 7 (1989). Because under the law of this circuit, evidence of a hidden compartment supports "probable cause" for a search/arrest, evidence indicating the existence of a hidden compartment also supports the lesser standard of "reasonable suspicion."[5]

_____

[3] *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238-39 (10th Cir. 2004).

_____

[4] *See also Sokolow*, 490 U.S. at 9-10 (holding that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion).

[5] *See United States v. Inocencio*, 40 F.3d 716, 724 (5th Cir. 1994) (holding that evidence of hidden compartment contributed to probable cause to search); *United States v. Price*, 869 F.2d 801, 804 (5th Cir. 1989) ("Once the agents had discovered the secret compartment they had probable cause to search the compartment itself."); *see also United States v. Nicholson*, 17 F.3d 1294, 1298 (10th Cir. 1994) (considering, among other factors providing probable cause, a "four or five-inch difference in the truck bottom and the floor which indicated a (continued...)

6

As we explained in *Innocencio*, 40 F.3d at 724, the "discovery of fresh paint (on a brand new truck) around the fender wells and the fresh undercoating beneath the bed of the truck" all contributed in creating "a reasonable belief that the vehicle contained a false compartment" and this "belief would create sufficient probable cause to search the vehicle." Similarly here, the discovery of the scratch marks and the adhesive created a reasonable belief that the vehicle contained a false compartment that has recently been used, and this belief created at least reasonable suspicion.

IV.

Because Villarreal's continued detention of Ramiro and Jorge after Villarreal obtained negative results from the computer check was supported by reasonable suspicion developed before 12:18, Ramiro's and Jorge's consent to the search the car at 12:23 was not unconstitutionally tainted.[6] Thus, the government's burden to

prove consent by the preponderance of the evidence is not as heavy as it would have been had a Fourth Amendment violation preceded the consent. *Dortch*, 199 F.3d at 201. We agree with the district court that the consent was free and voluntary.

The voluntariness of consent is a question of fact to be determined on the totality of the circumstances. *Id.* We look to (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) his education and intelligence; and (6) his belief that no incriminating evidence will be found. *Id.* Although all six factors are relevant, no single one is dispositive. *Id.*

Here, multiple factors favor a finding of voluntariness: The records shows that Ramiro and Jorge were calm and cooperative and does not indicate that Villarreal engaged in coercive tactics. Defendants' educational levels, however, and their testimony that they were not aware that they could refuse consent, favor a finding that the consent was not voluntary. But, we will not reverse the district court's finding that consent was voluntary unless it is clearly erroneous. *Id.* If the district court "bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses." *Id.*

Based on a review of the videotape, the district court found that the consent given was

---

[5](...continued)
hidden compartment designed to carry contraband"); *United States v. Martel-Martines*, 988 F.2d 855, 858-59 (8th Cir. 1993) (same); *United States v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990) (holding that evidence of hidden compartment, along with inadequate amount of luggage for claimed duration of trip, furnished probable cause); *United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir. 1997) (holding discovery of "what appeared to be a hidden compartment in the gas tank," along with evidence of air freshener and conflicting stories from the passengers, sufficient to furnish probable cause); *United States v. Toro-Pelaez,* 107 F.3d 819, 825 (10th Cir. 1997) ("Recent Fourth Amendment cases in this circuit and others have determined that evidence of a concealed compartment can give rise to reasonable suspicion of criminal activity.").

[6] *See Brigham*, 382 F.3d at 512 (reasoning that
(continued...)

---

[6](...continued)
absent a Fourth Amendment violation, consent to search a vehicle is not unconstitutionally tainted.

voluntary and was an independent act of free will. Therefore, because no single factor is dispositive, and because there were sufficient factors supporting consent (and the district court could have disbelieved defendants' testimony that they were unaware of their rights), there is no clear error.

After Villarreal searched the truck with defendants' permission, he obtained additional evidence that supported the prolonged detention, as the district court determined. The Estradas do not challenge the constitutionality of their detention following Villarreal's search of the truck. Even if they challenged it, Keane's discovery of a hidden compartment with the use of the scope constitutes probable cause, which would permit a warrantless search and the transfer of the car to the police station.[7] Therefore, we do not need to reach the issue of whether the removal of the car exceeded the scope of the consent.

The Estradas also complain about the use of the handcuffs after the discovery of the hidden compartment and before the move to the garage, but the handcuffs were not unconstitutional under a *Terry* stop analysis.[8] Finally, although the brothers also complain that they were not Mirandized until the marihuana was found, this complaint does not help their case, because they are not claiming that any information obtained from them in violation of *Miranda* was introduced in court.

AFFIRMED.

---

[7] "[P]olice officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." *Florida v. Meyers*, 466 U.S. 380, 381 (1984) (per curiam). The officers do not need to obtain a warrant to move the vehicle from the roadside to a garage if there is probable cause to search a vehicle. *See Chambers v. Maroney*, 399 U.S. 42, 48, 52 n.10 (1970) (observing that it "was not unreasonable . . . to take the car to the station house"); *United States v. Gastiaburo*, 16 F.3d 582, 586 (4th Cir. 1994) ("[T]he justification to conduct a warrantless search under the automobile exception does not disappear merely because the car has been immobilized and impounded."); *United States v. Lopez*, 777 F.2d 543, 550 (10th Cir. 1985) ("Under the 'automobile exception' then, the police conduct in moving Lopez from Interstate 40 to the Santa Rosa State Police office is proper if it was supported by probable cause.").

[8] *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) ("[T]he use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, does not necessarily convert a *Terry* stop into an arrest necessitating probable cause."); *United States v. Ricardo D.*, 912 F.2d 337, 340 (9th Cir. 1990) (holding that officers "may move a suspect from the location of the initial stop without converting the stop to an arrest when it is necessary for safety or security reasons"); *United States v. Bradshaw*, 102 F.3d 204 (6th Cir. 1996) (holding that the officer "could lawfully detain [defendant in the back of the squad car] until he had finished performing radio checks and issuing the citation," because it was "well within the bounds of the initial stop.").