# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30530

United States Court of Appeals
Fifth Circuit

**FILED**
July 27, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellant

v.

JESUS ALBERTO VILLAFRANCO-ELIZONDO,

Defendant - Appellee

Appeal from the United States District Court
for the Middle District of Louisiana

Before HIGGINBOTHAM, SOUTHWICK, and COSTA, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

Jesus Villafranco-Elizondo was driving from Texas to Louisiana when a law enforcement officer pulled him over for a couple of minor traffic violations. The officer claims that during the traffic stop, he developed a reasonable suspicion that the trailer contained contraband. After questioning Villafranco-Elizondo for approximately eleven minutes, the officer ran a check on his driver's license. Before the check was complete, the officer approached Villafranco-Elizondo with additional questions. During this exchange, Villafranco-Elizondo gave the officer consent to search the trailer, and a subsequent search found a hidden compartment containing cocaine. Villafranco-Elizondo filed a motion to suppress, arguing that his consent to

No. 17-30530

search was tainted because the traffic stop was both unjustified at its inception and unlawfully prolonged. The court granted the motion. We now reverse.

I.

Corporal James Woody of the West Baton Rouge Parish Sheriff's Office ("WBRSO") received an alert to be on the lookout for a white Chevrolet pickup truck with a green utility trailer (the "BOLO Alert"). Woody testified that he saw the truck driving down the highway and followed until he saw it following another car too closely and hitting the white fog line. Woody activated his vehicle's lights and his dashboard camera began recording. The truck pulled over onto the shoulder. Woody's partner Lieutenant Chris Green soon arrived and adjusted the dashboard camera in Woody's vehicle to record the stop.

Woody explained why he made the stop, and Villafranco-Elizondo responded that he suspected one of his tires had low pressure, indicating that might be why he struck the fog line. Woody asked about his itinerary and how long he had been driving. Villafranco-Elizondo responded that he had been driving for around two-and-a-half hours and that he was travelling from Houston, Texas, to Gonzales, Louisiana, to pick up a concrete crawler he had purchased online. During this conversation, Woody noticed a large suitcase in the backseat of the truck.

At the suppression hearing, Woody testified that, on approaching, he noticed several odd features of the trailer including: (1) that the trailer's gate was modified such that it would not be flush with the trailer floor when lowered, rendering the trailer's ramp nonfunctional; (2) that the trailer had reflective tape on the inside gate, where it served no apparent purpose; and (3) that the trailer had a diamond plate metal floor rather than a more typical wooden floor, making the trailer heavier. Woody claimed the modifications were all suspicious because each one made the trailer less functional.

2

About three minutes into the stop, Woody asked Villafranco-Elizondo to step out of the truck and walk to the back of the trailer. The dashboard camera recording shows Woody looked closely at the trailer before mentioning that the trailer floor looked "a little raised," and asking if it is "supposed to be like that." Woody also said the trailer looked like it had "weight on [it]."

Woody then turned the conversation back to Villafranco-Elizondo's trip, asking how long he planned to stay in Gonzales. Villafranco-Elizondo said just long enough to pick up the concrete crawler. Woody asked about the large suitcase, and Villafranco-Elizondo implied he might need the suitcase because he did not know how long it would take to load the crawler onto the trailer. When Woody asked whether the "little trailer" would hold the concrete crawler, Villafranco-Elizondo responded that it was not that large. Villafranco-Elizondo then returned to the truck to retrieve paperwork from the sale.

After briefly going through the paperwork, Woody asked Villafranco-Elizondo to walk back to the trailer. Now approximately seven minutes into the stop, Woody pointed out an unusual feature of the trailer, and Villafranco-Elizondo said that he purchased the trailer that way. Villafranco-Elizondo then showed Woody paperwork that said Villafranco-Elizondo purchased the concrete crawler for $1,500. Woody asked whether this was a good price, and Villafranco-Elizondo responded that this type of equipment usually costs around $12,000. Woody told Villafranco-Elizondo the deal sounded "too good to be true." After going through the paperwork, Villafranco-Elizondo acknowledged that he did not know the address where he would be picking up the crawler.

Woody then asked why there were locks on the trailer, and Villafranco-Elizondo responded that they were to prevent anyone from stealing the trailer. When Woody asked whether he had any issues with theft, Villafranco-Elizondo

said no. Woody again asked whether Villafranco-Elizondo "bought the trailer like this," and he said yes.

Eleven minutes into the stop, Woody returned to his vehicle to run a check on Villafranco-Elizondo's license and registration. Woody turned off his microphone when he entered the vehicle. He then spoke with Green, who exited the police car and visually inspected the trailer. Green later testified that he noticed the same modifications to the trailer and believed, based on his training and experience, that the trailer was modified to conceal and transport contraband.

Just under fourteen minutes into the stop, Woody exited his vehicle, restarted his microphone, and approached Villafranco-Elizondo. He told Villafranco-Elizondo that the license check was still running, and asked whether he had any criminal record. He then asked Villafranco-Elizondo if he was responsible for everything in the truck and trailer. Villafranco-Elizondo said yes. Woody said that the trailer looked suspicious and asked whether there was anything illegal in the truck or trailer. Villafranco-Elizondo said no. He then told Woody "you can check whatever you want, that's fine." Woody responded, "I can check, I can search it, you're fine with that? Both the trailer and the truck?" Villafranco-Elizondo said yes.[1] Woody asked Villafranco-Elizondo to wait a few steps away from the trailer. He then lowered the trailer's gate, called Villafranco-Elizondo back over, and pointed out the misaligned ramp.

About sixteen minutes into the stop, Woody and Green placed Villafranco-Elizondo in handcuffs and read him his *Miranda* rights. Green informed Villafranco-Elizondo that there was "no doubt in [his] mind this

---

[1] At no point during this exchange did Woody mention that Villafranco-Elizondo could refuse the search or withdraw consent.

trailer [was] loaded . . . with contraband," and he again asked Villafranco-Elizondo if there was anything illegal in the trailer. The officers then began to inspect the trailer. Green testified that he noticed fresh "bondo dust" and paint on the trailer, which indicated that the trailer had been modified. Woody testified that he also noticed "weak welds" on the tailgate, which again signaled that the trailer had been modified. Green testified that he brought out a density meter to measure the density of various parts of the trailer, and that the device gave inconsistent density readings, which he considered more evidence that the trailer contained a hidden compartment. The officers also looked underneath the trailer, where Green claims he noticed fresh mud smears that could have been intended to conceal modifications.

Approximately thirty-nine minutes in, Woody directed his canine to perform a "free air sniff" of the trailer. The dog did not come to a final response. Woody testified that the dog's behavior indicated that he detected an overwhelming odor of narcotics that could not be pinpointed. After the canine search, Woody and Green decided to move the vehicle to the WBRSO workshop to continue the search. At the workshop, the officers drilled into the trailer and found cocaine on the drill bit.  The officers eventually recovered thirty-one kilograms of cocaine from hidden compartments inside the trailer.

On October 13, 2016, a grand jury returned a one-count indictment for possession with intent to distribute more than five kilograms of cocaine. On November 22, 2016, Villafranco-Elizondo filed a motion to suppress the evidence. After a hearing, the district court found that the traffic stop was valid at its inception, but that Woody lacked reasonable suspicion to extend the stop beyond the eleven-minute mark and that Villafranco-Elizondo's consent was invalid. The court also ruled that, even if there had been reasonable suspicion to prolong the stop, that suspicion dissipated when the canine failed to alert to

narcotics. The court suppressed the evidence obtained from the search. The government appealed.

## II.

On appeal from a motion to suppress, we "review the district court's factual findings for clear error and its legal conclusions de novo."[2] "A factual finding is not clearly erroneous if it is plausible in light of the record as a whole."[3] The evidence should be viewed "in the light most favorable to the prevailing party."[4] "[I]n carrying out this de novo review, we must give due weight to inferences drawn from [the] facts by resident judges and law enforcement officers."[5]

## III.

We evaluate the legality of a traffic stop under the two-step framework of *Terry v. Ohio*, asking first whether "the officer's action was justified at its inception"—that is, whether the initial stop was valid—and then whether the officer's subsequent actions "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop."[6]

### A.

A lawful traffic stop must be based on "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred or is about to occur."[7] This is a fact-specific inquiry. "The correct analysis

---

[2] *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007).

[3] *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008) (quoting *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001)) (internal quotation marks omitted).

[4] *United States v. Cervantes*, 797 F.3d 326, 328 (5th Cir. 2015) (internal quotation marks omitted).

[5] *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)) (internal quotation marks omitted).

[6] *United States v. Brigham*, 382 F.3d 500, 506–07 (5th Cir. 2004) (en banc).

[7] *Lopez-Moreno*, 420 F.3d at 430.

requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances."[8]

Woody testified that he observed two traffic violations: following another car too closely and striking the fog line. Neither violation appears to have been captured by Woody's dashboard camera.[9] Woody explained that his camera automatically begins recording when he activates his vehicle's rear lights, and that he activated his rear lights after witnessing the traffic violations.

Villafranco-Elizondo does not refute this explanation. Instead, he argues that the alleged traffic violations were mere "pretext" for a drug interdiction stop. Essentially, he argues that after receiving the BOLO Alert, Woody followed the truck until he was able to "create or develop a reason to stop Villafranco and search his vehicle." But "subjective motivations of police are deemed irrelevant as long as their conduct does not exceed what they are objectively authorized to do."[10]

The district court held the initial traffic stop was valid, "notwithstanding the fact that the recording [from the dashboard camera] does not corroborate . . . the violations." In doing so, the court credited Woody's explanation that he witnessed the traffic violations before the dashboard camera began recording. While the footage does not show the alleged traffic violations, it is otherwise consistent with Woody's testimony. We find no error here.

---

[8] *Brigham*, 382 F.3d at 507.

[9] Woody testified that the dashboard camera footage showed Villafranco-Elizondo following too closely, but the district court found that "the recording does not corroborate the violations." This finding is not clearly erroneous, particularly in light of the defense expert's testimony that "from what [he] saw, [the distance] didn't appear to be too close."

[10] *United States v. Bams*, 858 F.3d 937, 943 (5th Cir. 2017) (internal quotation marks omitted).

No. 17-30530

B.

Turning to the second inquiry, we ask whether the officer's subsequent actions "were reasonably related to the circumstances that justified the stop" or, in the alternative, "to dispelling his reasonable suspicion developed during the stop."[11] This we ask because a traffic stop may only last "as long as is reasonably necessary to effectuate the purpose of the stop."[12] "Once the purpose justifying the stop has been served, the detained person must be free to leave."[13]

Law enforcement officers have some latitude when speaking to a suspect during a routine traffic stop. For example, "a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. An officer may also ask the driver about the purpose and itinerary of his trip."[14] Within this framework, however, "[t]he permissible duration of the stop is limited to the time reasonably necessary to complete a brief investigation of the matter within the scope of the stop. . . . An officer may ask questions outside the scope of the stop, but only so long as such questions do not extend the duration of the stop. It is the length of the detention, not the questions asked, that makes a specific stop unreasonable."[15]

Applying this general principle, we have held that in a traffic stop, "once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention."[16] The record before us does not

---

[11] *Brigham*, 382 F.3d at 507.

[12] *Id.* at 512.

[13] *United States v. Machuca-Barrera*, 261 F.3d 425, 432 (5th Cir. 2001).

[14] *Lopez-Moreno*, 420 F.3d at 430–31 (internal citations omitted).

[15] *Machuca-Barrera*, 261 F.3d at 432.

[16] *Lopez-Moreno*, 420 F.3d at 431.

reveal when the license check was complete because Woody exited his vehicle before receiving the results. While the check was running, Woody continued to question Villafranco-Elizondo, eventually securing his consent to search the truck and the trailer. Accordingly, we cannot determine whether the license check was complete when Villafranco-Elizondo consented to the search.

Yet we need not answer that question if, when the license check began, Woody had already developed reasonable suspicion that another crime was afoot. Where an officer develops reasonable suspicion of another crime—e.g., drug trafficking—during the course of a traffic stop, he may prolong the suspect's detention until he has dispelled that newly-formed suspicion.[17] Therefore, we must decide whether, and when, Woody developed the reasonable suspicion necessary to prolong the detention. In doing so, "[w]e must pay heed to the Supreme Court's admonition not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances."[18] And "in drawing inferences . . . , we must give due weight to the inferences drawn by both the trial court and law enforcement officers."[19]

Faced with this question, the district court concluded that Woody did not develop the suspicion necessary to extend the traffic stop beyond eleven minutes. The district court identified two possible bases for Woody's suspicion—Villafranco-Elizondo's demeanor and modifications to the trailer—and held that neither supported reasonable suspicion. We disagree.

The district court considered Woody's claim that Villafranco-Elizondo appeared nervous and tried to distance himself from the trailer during

---

[17] *Brigham*, 382 F.3d at 507.

[18] *Lopez-Moreno*, 420 F.3d at 433. *See also United States v. Estrada*, 459 F.3d 627, 631–32 (5th Cir. 2006) ("The determination of whether [the officer] had developed a reasonable suspicion must be based on the totality of the circumstances and the collective knowledge and experience of the officer[s].").

[19] *Lopez-Moreno*, 420 F.3d at 433.

No. 17-30530

questioning. The district court rejected Woody's characterization. Instead, upon viewing the dashboard camera recording, the court found that the defendant only returned to his truck to obtain paperwork to respond to Woody's questions. We find the district court could reasonably conclude that Villafranco-Elizondo was not being evasive and that he returned to the truck only to obtain paperwork.

But the district court overlooked other aspects of the encounter relevant to reasonable suspicion. Regardless of his demeanor, Villafranco-Elizondo's answers to some of Woody's questions were suspicious: he stated that he was planning at most an overnight stay, but had packed a large suitcase; he could not provide an address where he planned to pick up the equipment he had purchased; and he claimed to have purchased a concrete crawler for only 12.5% of its usual going rate, a deal that seemed "too good to be true."

The district court did consider the modifications to the trailer, but ultimately concluded that they were insufficient to create reasonable suspicion of criminal activity. The district court relied on *United States v. Madrigal*, an unpublished opinion of this court that found no reasonable suspicion to extend a traffic stop based on: (1) the defendant's travel itinerary; (2) "the fact that [the defendant] drove an older and recently registered truck"; and (3) the defendant's arrest record from fourteen years prior.[20]  On the second factor, *Madrigal* held that "[a]lthough a vehicle feature may create suspicion, it is slight unless the characteristic is 'so unique in the area as to inherently raise suspicions.'"[21] In this case, the district court focused on that language, finding that the trailer's "abnormalities" were not so unique because "Texas law allows for an infinite number of trailers [with] an infinite number of modifications,"

---

[20] *United States v. Madrigal*, 626 F. App'x 448, 450–51 (5th Cir. 2015) (per curiam) (unpublished).
[21] *Id.* at 451.

10

and thus the combination of modifications alleged in this case were not inherently suspicious.

The district court's reliance on *Madrigal* is misplaced. In *Madrigal*, the officer stated that driving "an older and recently registered truck" created suspicion because "many drug couriers use such vehicles."[22] That is to say, the vehicle was suspicious only because it fit into a particular profile. And, as we noted, it was not particularly suspicious because such a truck is also "a mode of transport for millions of low-income Americans."[23] The situation here is qualitatively different. The modifications alleged are not features common to transport for millions of Americans, nor are they "mere customization[s] of the vehicle that could also support a conclusion of innocent travel."[24] The officers testified that the modifications were consistent with a hidden compartment, and we have repeatedly held that such evidence can lead to reasonable suspicion or even probable cause.[25] After all, "[i]t is hard to conceive of a legitimate use for a large hidden storage compartment in any part of a vehicle."[26]

---

[22] *Id.*

[23] *Id.* at 452.

[24] *Estrada*, 459 F.3d at 632.

[25] *See, e.g.*, *United States v. Bams*, 858 F.3d 937, 944 (5th Cir. 2017) (finding that an officer had the reasonable suspicion necessary to prolong a traffic stop based on the fact that the driver appeared nervous, there was a single key in the car's ignition, there were energy drinks in the vehicle, and—most importantly—"the driver's-side rear quarter panel appeared to have been tampered with," a fact that indicated the potential existence of a hidden compartment); *Estrada*, 459 F.3d at 632 (holding that an officer's testimony that he saw adhesive and scratch marks consistent with modifications to the car's gas tank, combined with the officer's experience and the fact that the vehicle had recently arrived from Mexico, created reasonable suspicion that the gas tank contained a hidden compartment used to transport drugs); *United States v. Inocencio*, 40 F.3d 716, 724 (5th Cir. 1994) (holding that "a reasonable belief that the vehicle contained a false compartment . . . would create sufficient probable cause to search the vehicle"); *see also United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010) (holding that an officer had an "objective basis for suspecting legal wrongdoing" where evidence suggested that a vehicle had been modified to allow access to a hidden compartment).

[26] *Estrada*, 459 F.3d at 632.

When evaluating the likelihood that a modification indicates a hidden compartment, "[c]ourts must allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[27] Woody had significant experience in drug interdiction: he worked in the WBRSO criminal interdiction unit for five years; performed hundreds of traffic stops; and received training in detecting hidden compartments and vehicle modifications. He also had significant personal experience with this particular type of trailer.

Taken together, we find that the modifications to the trailer created "a reasonable belief that the vehicle contained a false compartment . . . , and this belief created at least reasonable suspicion" to prolong the detention.[28] Thus, we conclude that Villafranco-Elizondo's consent to search was not tainted by any unlawful detention.

We do not suggest that a law enforcement officer may circumvent these principles by ignoring the results of a license check until he has developed reasonable suspicion to prolong a detention. The record here supports the conclusion that Woody noticed a number of modifications to the trailer *before* he initiated the license check at the eleven-minute mark. In fact, the recording shows that Woody was alert to the possibility of a hidden compartment in the first four minutes of the stop. We do not, because we need not, address what would happen if an officer developed reasonable suspicion only *after* a license check is complete but before the officer learns its results.

---

[27] *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotation marks and citations omitted).

[28] *Estrada*, 459 F.3d at 633.

No. 17-30530

IV.

Approximately thirty-nine minutes into the stop, the officers began a canine search of the vehicle. The parties disagree over its result. The government contends that the dog "indicated the presence of a narcotics odor but did not give a final response because the odor was overwhelming." Villafranco-Elizondo accuses the officers of fabricating this explanation.

The district court found that the dog did not alert, and went on to hold that even if the officers had developed reasonable suspicion earlier in the stop, "any reasonable suspicion of criminal activity most certainly ended when the dog failed to alert." The court reasoned that "[t]he illegal activity suspected was contraband, not compartments," and that the dog's failure to alert indicated that the trailer contained no contraband. The government challenges this logic, arguing that a negative result on a canine search does not overcome reasonable suspicion because (1) traffickers can sometimes successfully disguise the scent of narcotics and (2) "the deputies had ample independent facts supporting a reasonable belief [that] the trailer contained a hidden compartment."

Circuits are divided over whether a dog's failure to alert necessarily destroys an officer's reasonable suspicion. The Eighth and Tenth Circuits have held that a dog's failure to alert on a package does not automatically dissipate reasonable suspicion, holding that "[t]he factors giving rise to reasonable suspicion in the first place remain[] unchanged" by a canine search.[29] However, the Sixth Circuit has held that when a drug-detection dog with a ninety-percent success rate fails to alert on an automobile, reasonable suspicion is dispelled.[30]

---

[29] *See United States v. Lakoskey*, 462 F.3d 965, 977 (8th Cir. 2006) (quoting *United States v. Ramirez*, 342 F.3d 1210, 1212 (10th Cir. 2003)).

[30] *United States v. Davis*, 430 F.3d 345, 356 (6th Cir. 2005).

13

No. 17-30530

We have never spoken on that precise question; however, we have previously rejected the notion that the failure of a drug dog to alert deprives officers of existing probable cause.[31] We apply that principle here. By the time the canine search began, the officers had developed probable cause to search the vehicle. In addition to the evidence that gave rise to Woody's initial suspicion, the officers uncovered several additional pieces of evidence indicating that the trailer had been modified, including weak welds on the tailgate, mud smeared underneath the trailer, bondo dust and fresh paint, and inconsistent readings from the density meter. Here, the totality of the circumstances led the officers, based on their training and experience, to conclude that the trailer contained a hidden compartment—a conclusion that, with all the other circumstances, supported probable cause. Under these circumstances, the dog's failure to alert did not eliminate the officer's existing probable cause.

V.

We reverse the district court's ruling on the motion to suppress and remand for further proceedings.

---

[31] *United States v. Williams*, 124 F. App'x 885, 887 (5th Cir. 2005) (unpublished).

14