# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
March 30, 2020

Lyle W. Cayce
Clerk

No. 18-31294

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

VICTOR ZELAYA-FUNEZ, also known as Victor Funes,
also known as Vic F. Funes, also known as Victor.Funes3,

Defendant - Appellant

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:17-CR-90-1

Before DAVIS, JONES, and ENGELHARDT, Circuit Judges.

PER CURIAM:*

Victor Zelaya-Funez appeals his convictions for sexual exploitation of a minor and for possession of child pornography, seeking retrial because statements from plea discussions were used against him at trial. Zelaya contends that he did not understand an English-language provision waiving his right to exclude those statements, even though he discussed the waiver provision in Spanish with his attorney and then indicated his consent to the

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

waiver by signature. The district court, however, found that Zelaya knowingly waived his right. We agree and AFFIRM.

## BACKGROUND

In June 2016, Zelaya downloaded sexually explicit images of the fifteen-year-old daughter of his girlfriend. After viewing them multiple times over the course of several weeks, he messaged the girl, repeatedly requesting that she send him pictures and video of herself. She refused. Zelaya then promised favors if she complied and threatened to tell her parents if she refused again. About this time, the girl's mother happened to borrow her device. She discovered Zelaya's messages and alerted the police.

The government charged Zelaya with sexual exploitation of a minor in violation of 18 U.S.C. § 2251(a), (e) and with possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). The court appointed counsel for Zelaya, but he then retained Ivan Alberto Orihuela to replace that counsel.

A few months later, the government proposed a plea agreement. According to the proposal, Zelaya would plead guilty to the sexual-exploitation count, and, in exchange, the government would dismiss the child-pornography count, as well as a separate indictment for illegal re-entry by a removed alien. The plea agreement would include a stipulated factual basis and would provide that this factual basis, with the rest of the plea agreement, would be admissible should Zelaya not plead guilty.

The agreement was written in English, and Zelaya, who is Honduran, reads and speaks only Spanish. Orihuela, however, speaks Spanish, too, having grown up in a Spanish-speaking Puerto Rican family. He represents a clientele that is "about 99 percent . . . Spanish-speaking . . . from various different countries," and, in his twenty-four years of experience, he has translated thousands of documents from English to Spanish for clients. Orihuela went through the plea agreement page by page with Zelaya,

No. 18-31294

describing in Spanish what each provision meant, and Zelaya signed the agreement, promising to plead guilty at re-arraignment.

At the start of re-arraignment, though, Orihuela informed the court that Zelaya had decided to plead not guilty instead. In response, government counsel advised the court that he intended to introduce the plea agreement, including its factual basis, as evidence at trial. An official court interpreter translated government counsel's statements, and all statements at the hearing, into Spanish for Zelaya. The court authenticated the signatures on the plea agreement and then reiterated to Zelaya that the government intended to try to use the plea agreement at trial. The court asked Zelaya whether he understood this and whether he had any questions; Zelaya stated that he understood and that he had no questions.

Thereafter, the government filed its promised motion for a pre-trial ruling on the admissibility of the plea agreement. Zelaya opposed the motion, relying on Federal Rules of Evidence, Rule 410, which prohibits admission of "a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea." The government noted that Zelaya's signed plea agreement stated that he "expressly and voluntarily waive[d] the protection afforded by Fed. R. Evid. 410" and that he "fully underst[oo]d the agreement." Zelaya, however, maintained that he did not waive Rule 410 knowingly because he could not read or understand English, the language of the plea agreement and its Rule 410 waiver.

The district court held two hearings on this matter. In the first, it determined that (1) "the plea agreement was breached," (2) "the signatures appearing on the plea agreement . . . were properly authenticated on the record," (3) "the plea agreement clearly and unambiguously waives Defendant's rights," and (4) "the burden of proof regarding the admissibility of

No. 18-31294

the plea agreement at trial has been shifted to Defendant to demonstrate that he entered into the agreement involuntarily and without sufficient knowledge of its contents."

In the second hearing, Zelaya sought to demonstrate lack of sufficient knowledge.[1]  He testified that Orihuela read the plea agreement to him, but that he knew, not what the document contained, but only what Orihuela told him it contained.  Zelaya testified further that he did not remember whether he was told that the plea agreement included a factual basis, but that he remembered that at least some of the facts were read to him.  According to his testimony, he remembered clearly that Orihuela did not mention that the stipulated facts would be used against him in court.  Instead, he testified, Orihuela told him that, if he did not want the agreement, he could "tear it up and throw it out."  He was "sure that I wasn't told anything" about the document being used as evidence against him.

On cross-examination, Zelaya stated that he "didn't have any trouble understanding what [Orihuela] was saying, but I didn't know if what he was saying was what was written in the paper."  On the other hand, he confirmed that he continued to speak with Orihuela in court, even though certified interpreters were available.  Zelaya testified that Orihuela translated each page of the document, discussing it in Spanish.  When asked, though, whether the provision certifying that he had discussed the agreement with his attorney—a provision interpreted for him at that moment by a court interpreter—had been translated for him by Orihuela, Zelaya answered, "Supposedly everything that was there he translated for me, but I don't know because, like I told you before, I don't know how to read the English."  When pressed, Zelaya stated, "I remember everything -- I remember that he was

---

[1] The district court appointed conflict counsel for this hearing.

reading everything in the document.  But I don't know if he was telling me the truth because I cannot read the document in English."  When pressed again, he answered likewise.  When asked whether he recalled hearing the words just translated for him having been translated by Orihuela, Zelaya answered, "Some things I remember, but I don't remember everything."

Orihuela took the stand next.  He testified that he went through the plea agreement "page by page and line by line with Mr. Zelaya."  He testified further that, for some legal terms that he thought might be difficult to translate or difficult for Zelaya to understand, he "would try to explain it in more of layperson's terms."  He maintained that, while he translated, he "had every indication that [Zelaya] understood what I was translating for him" and that "he seemed to be following along with me."  Of central importance, Orihuela testified that he interpreted the "Consequences of Breach" section and that he gave particular attention to explaining that "if [Zelaya] were to decide not to plead guilty . . . that there was a potential that this plea agreement could be used against him in court."

The court deemed Orihuela's testimony credible and Zelaya's unclear, equivocal, and evasive.  Consequently, finding that Zelaya waived his Rule 410 protection knowingly and voluntarily, the court ruled that the plea agreement was admissible evidence.  At trial, the government introduced a redacted copy of the plea agreement and read some of its factual basis to the jury.[2]  At the conclusion of trial, the jury found Zelaya guilty of both sexual exploitation of a minor and possession of child pornography.  The court sentenced him to 185 months in prison, a downward departure from the Sentencing Guidelines recommendation.  Zelaya timely appealed, contending that the court erred in

---

[2] Before trial, the court granted Orihuela's motion to withdraw as counsel and appointed new counsel to represent Zelaya.

No. 18-31294

finding that he knowingly waived his right to keep the plea agreement inadmissible at trial.

## STANDARD OF REVIEW

A district court's admission of plea statements as evidence, "if objected to, is reviewed for abuse of discretion." *United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Towns*, 718 F.3d 404, 407 (5th Cir. 2013) (quoting *United States v. Jackson,* 636 F.3d 687, 692 (5th Cir. 2011)). In general, "[a] factual finding is not clearly erroneous if it is plausible in light of the record as a whole," *United States v. Villafranco-Elizondo*, 897 F.3d 635, 640 (5th Cir. 2018) (quoting *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008)), and if an evidentiary ruling is "based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses," *see United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005). "We review the evidence in the light most favorable to the prevailing party, which in this case is the government." *Id.*

## DISCUSSION

On appeal, Zelaya admits that Orihuela "translated the Rule 410 waiver provision," but he contends that he did not understand Orihuela's translation. As proof of this contention, he relies on his sworn testimony at the hearing and on the facts that Orihuela paraphrased the provision at issue rather than translating it word for word, that Orihuela's first language was not Spanish, that Orihuela learned Spanish from his Puerto Rican family, not Honduran speakers, and that Orihuela was not a certified translator.

It is well beyond plausible, though, that Orihuela translated the Rule 410 waiver in a manner comprehensible to a Honduran-Spanish-speaker. Orihuela has translated thousands of legal documents into Spanish, and his

6

large Spanish-speaking clientele hails from different countries. He was alert to different dialects at the hearing—as he exhibited, for example, by his testimony that the word *rechazar* might bear different translations in different countries. There is no reason to think that this alertness developed only then. Nothing in the record establishes that Orihuela's explanation of the Rule 410 waiver—"that if he were to decide not to plead guilty . . . there was a potential that this plea agreement could be used against him in court"—would be understood differently by Honduran clients than by any other Spanish-speaking clients.[3] To be sure, Orihuela's use of layman's terms in his explanation of the provision is weak evidence against the comprehensibility of his translation.

In face of an objectively understandable translation, then, it is plausible, at least, that Zelaya understood the Rule 410 waiver provision. A person who has heard a comprehensible explanation of a contract provision may be presumed to have understood that explanation. Further, Zelaya gave no indication of misunderstanding, either during the discussion with Orihuela or at re-arraignment, when the judge asked him whether he had any questions about the government's intention to use his plea agreement against him.

That leaves only Zelaya's testimony to establish that he did not understand Orihuela's translation. In that self-serving testimony, Zelaya repeatedly refused to answer whether Orihuela's Spanish-language discussion of particular provisions matched the Spanish-language interpretation of those

---

[3] This would hold true even if Orihuela had said something like: "By signing this document, *rechazas/rechaza* the right to have the plea agreement's factual basis not used against you." Whether *rechazar* means "to reject or turn down" or "to tear up and throw out" in the Honduran dialect of Spanish makes no difference when applied to "right" as its direct object. In the event, although Orihuela testified that he generally uses "rechazar" to translate "waive your rights" in discussions with clients, he testified that his formulation of the effect of a breach of contract was that "this plea agreement could be used against him."

provisions provided by the certified court interpreter. He refused on the ground that he cannot read English—a non sequitur that the court could plausibly interpret, while also considering Zelaya's demeanor, as evasive. The plausibility of this credibility finding is not defeated by Zelaya's argument on appeal that the statements of his testimony are logically consistent with the statements of Orihuela's testimony, for logical contradiction is not the only sign or effect of evasion, ambiguity, or equivocality. The court reasonably deemed Zelaya's testimony incredible, and, as such, that testimony was no obstacle to finding that Zelaya knew about the Rule 410 waiver provision.

In light of the record as a whole, it is indeed plausible that Zelaya knew of the provision to let the government use the contents of his plea agreement as evidence if he should not plead guilty. In finding that Zelaya had such knowledge, therefore, the district court did not clearly err.

## CONCLUSION

The judgment of the district court is **AFFIRMED** as modified.[4]

---

[4] The statute of conviction for count 2, possession of child pornography, is 18 U.S.C. § 2252A(a)(5)(B).